# United States Court of Appeals
## For the First Circuit

Vol. I of II

No. 01-1619

UNITED STATES OF AMERICA,

Appellee,

v.

WILLIAM SOTO-BENÍQUEZ,

Defendant, Appellant.

No. 01-1674

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN SOTO-RAMÍREZ,

Defendant, Appellant.

No. 00-1547

UNITED STATES OF AMERICA,

Appellee,

v.

EDUARDO ALICEA-TORRES,

Defendant, Appellant.

No. 01-1620

UNITED STATES OF AMERICA,

Appellee,

v.

RAMON FERNÁNDEZ-MALAVÉ,

Defendant, Appellant.

_____

No. 00-1464

UNITED STATES OF AMERICA,

Appellee,

v.

CARMELO VEGA-PACHECO,

Defendant, Appellant.

_____

No. 00-1488

UNITED STATES OF AMERICA,

Appellee,

v.

ARMANDO GARCÍA-GARCÍA,

Defendant, Appellant.

_____

No. 00-1470

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE LUIS DE LEÓN MAYSONET,

Defendant, Appellant.

─────────────

No. 00-1362

UNITED STATES OF AMERICA,

Appellee,

v.

RENE GONZALEZ-AYALA,

Defendant, Appellant.

─────────────

No. 00-1543

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN ENRIQUE CINTRÓN-CARABALLO,

Defendant, Appellant.

─────────────

No. 00-1361

UNITED STATES OF AMERICA,

Appellee,

v.

MIGUEL VEGA-COLÓN,

Defendant, Appellant.

───────────────

No. 00-1456

UNITED STATES OF AMERICA,

Appellee,

v.

MIGUEL VEGA-COSME,

Defendant, Appellant.

───────────────

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Daniel R. Domínguez, U.S. District Judge]

───────────────

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

───────────────

Marlene Apontes-Cabrera for appellant Soto-Beníquez.
Miriam Ramos-Grateroles for appellant Soto-Ramírez.
Raymond Rivera Esteves for appellant Alicea-Torres.
Luz M. Rios-Rosario for appellant Fernández-Malavé.
Javier Morales-Ramos for appellant Vega-Pacheco.
Rachel Brill for appellant García-García.
Roberto Roldan-Burgos for appellant de León Maysonet.
Victor Miranda-Corrada, for appellant Gonzalez-Ayala.
Rafael Anglada-Lopez for appellant Cintrón-Caraballo.
Marcia G. Shein for appellants Vega-Cosme and Vega-Colón.

Jacabed Rodriguez-Coss and Michelle Morales, Assistant United States Attorneys, with whom H.S. Garcia, United States Attorney, and Sonia I. Torres-Pabon, Assistant United States Attorney, were on brief, for appellee.

---

November 20, 2003

---

**LYNCH**, **Circuit Judge**.  This massive drug conspiracy case from Puerto Rico involved a six-month trial and resulted in convictions of the eleven defendants who appeal, eight of whom received life sentences and three of whom received sentences of more than twenty years.

The government charged this case as involving one overarching conspiracy from January 1990 to March 1994 to distribute drugs at Bitumul (Israel Ward) in Hato Rey, San Juan, Puerto Rico and to protect that distribution through multiple murders.  Twenty-two defendants were indicted on charges of conspiracy with intent to distribute more than five kilograms of cocaine, more than five kilograms of cocaine base, more than five kilograms of heroin, and more than 100 kilograms of marijuana over a four-year period, in violation of 21 U.S.C. § 841(a)(1).  Two of these defendants, William Soto-Beníquez and Juan Soto-Ramírez (a/k/a Pipo), were also charged with violating the Continuing Criminal Enterprise (CCE) statute, 21 U.S.C. § 848(a) and (b).  The government alleged that Soto-Ramírez headed the conspiracy and that Soto-Beníquez was the triggerman and principal supplier.  The remaining nine appellants were charged with playing various roles in distributing drugs or protecting the distribution of drugs.

The original twenty-two defendants were separated into two groups.  The first group of eleven, comprised of those who the government said were more major players in the conspiracy, were

tried before a jury from December 28, 1998 to June 25, 1999. The jury convicted all eleven defendants on all counts with which they were charged.

The two CCE defendants were sentenced to life imprisonment on Count One, the CCE count, while Count Two, the conspiracy count, was dismissed as to them under the rule of Rutledge v. United States, 517 U.S. 292 (1996). Six other defendants were also sentenced to life imprisonment: Alicea-Torres, Fernández-Malavé, Vega-Pacheco, García-García, Vega-Cosme, and Cintrón-Caraballo. The remaining three -- Vega-Colón, Gonzalez-Ayala, and de León Maysonet -- were each sentenced to 292 months of imprisonment.

These appeals present three substantial issues: a multiple conspiracy issue, an issue of improper argument by the government in its rebuttal closing argument, and a set of Apprendi sentencing issues. Defendants' key theme on appeal is that the government overcharged the conspiracy in at least two significant respects. First, defendants argue that, assuming Soto-Beníquez and Soto-Ramírez did distribute drugs to points in Bitumul from 1990 until late 1992 or early 1993, the drug points were largely independent; the fact of a common supplier does not mean the independent drug point operators agreed to a conspiracy, much less to the ensuing murders. Second, defendants argue that, by late 1992, both Soto-Beníquez and Soto-Ramírez were out of action: one

-7-

had been imprisoned and the other had left for Florida after narrowly escaping an attempt on his life. Any conspiracy was by then concluded, defendants assert, and the government's attempts to include another year's worth of events, until March 1994, in the conspiracy were improper. Those events involved a different and rival drug dealer, Rodríguez-López (a/k/a El Bebo), and took place partly in another town called Fajardo. The defendants argue that if their theory as to multiple conspiracies is correct, then there are significant ramifications that affect the application of the statute of limitations, the admissibility of testimony (particularly, evidence of fifteen horrific murders), the refusal to sever certain defendants, and various sentencing determinations.

The defendants also complain, with justification, about the government's poor record of pre-trial production of required materials, as well as its belated springing of requested sentencing enhancements on certain defendants after the Pre-Sentence Investigative Report (PSR) had been prepared and the defendants' objections to it had been served. The trial court was obviously frustrated with the government's conduct in this case and threatened three times to dismiss the indictment, but in the end did not. Post-trial, the court also found the evidence sufficient to support the convictions.

Over twenty-five issues are raised in these appeals and are discussed in the sequence of events leading to and through

trial, with the exception of the multiple conspiracies issue, which we discuss first.

**I.**

The facts are stated, for sufficiency of the evidence purposes, as a reasonable jury could have found them, in the light most favorable to the verdict.

The government's case turned on the testimony of several cooperating co-conspirators -- Ramón Cesário-Soto, Victor Negrón-Maldonado (a/k/a Pitosito), and Luis Torrens-Alicea (a/k/a Pito Salsa) -- as well as the testimony of police officers and investigators.

The case centers around six drug points in the Bitumul Ward of Hato Rey, San Juan, Puerto Rico: (1) Callejón Nueve, operated by Juan Soto-Ramírez and later by Negrón-Maldonado, (2) La Pared, also operated by Soto-Ramírez, (3) Street B between La Pared and Callejón Nueve, operated by Juan Cintrón-Caraballo and supplied by Soto-Ramírez, (4) El Palo on Laguna Street, operated by Alberto Santiago-Figueroa, a defendant not participating in this trial, and supplied by Soto-Ramírez, (5) Cuba Street, which included two distribution points operated by Soto-Beníquez and Soto-Ramírez, and (6) Laguna Street, operated by Miguel Vega-Cosme. These points, which began operation around 1990, dealt in crack cocaine, cocaine, heroin, and marijuana.

Soto-Ramírez and Soto-Beníquez were the leaders of the operation. Soto-Ramírez operated or supplied almost all of the drug points. His house at Callejón Dos was used by various defendants to prepare crack and heroin for distribution at the six drug points and to store weapons to defend and acquire territory for the drug points. When defendant Miguel Vega-Cosme established his drug point on Laguna Street with his son, defendant Miguel Vega-Colón, he first requested permission from Soto-Ramírez.

Soto-Beníquez served as the triggerman and principal supplier. He ultimately supplied most of the narcotics sold at the drug points and owned many of the weapons used to kill rival gang members. Cesário-Soto described him as "one with ranks" in the drug world.

The remaining defendants were involved in running one or more of the six drug points. Eduardo Alicea-Torres sold drugs at the Cuba Street and Callejón Dos drug points from 1990 until at least 1991, and later began his own drug point. Ramon Fernández-Malavé packaged crack and cocaine for Soto-Ramírez and cooperating government witness Negrón-Maldonado in 1992. Carmelo Vega-Pacheco packaged drugs for Soto-Ramírez and Negrón-Maldonado through 1992, and sold narcotics at the Cuba Street drug points in 1990 and 1991. Armando García-García sold narcotics at the Cuba Street drug points from 1990 to 1991, packaged drugs in 1992, and sold drugs at Callejón Nueve in 1993. From 1990 to 1992, Jose de León Maysonet

stored narcotics and weapons for the drug points, and after 1992, he sold narcotics at Callejón Nueve. Juan Cintrón-Caraballo operated the Street B drug point throughout the charged conspiracy. Miguel Vega-Cosme supplied Soto-Ramírez with narcotics and operated a drug point at Laguna Street from 1990 until 1994 with Soto-Ramírez's permission. Vega-Cosme also supplied ammunition used in shootings of rival gang members in 1992 and 1993, and negotiated on behalf of the group in seeking to resolve its differences with the rival Chacho gang. Miguel Vega-Colón, the son of Vega-Cosme, packaged crack cocaine, heroin, and marijuana for his father and stood as an armed guard at the Callejón Nueve drug point, a point separate from the one his father ran on Laguna Street.

Several of the defendants were involved in a series of murders undertaken to defend and acquire territory in Bitumul on behalf of the conspiracy. The first of these killings occurred on February 10, 1991. Soto-Ramírez confessed to Negrón-Maldonado that he, along with two deceased members of the conspiracy, killed Dagoberto Robles-Rodríguez because he felt threatened by Robles-Rodríguez. Soto-Ramírez then gained control of Robles-Rodríguez's heroin point on Cuba Street. Soto-Ramírez pled guilty in a Puerto Rico court to Robles-Rodríguez's homicide.

Another killing occurred on February 20, 1991. As government informant Ana Luz Dones-Arroyo was leading undercover police officer Efrain Hernández de León to the location at Callejón

Dos where Soto-Ramírez and others stored their weapons, both were gunned down. Soto-Ramírez shot Dones-Arroyo, and defendant Alicea-Torres killed the police officer and disposed of the body. A ballistics expert testified that the same two weapons used in the murder of Robles-Rodríguez were used to kill Dones-Arroyo and Hernández de León.

According to Negrón-Maldonado's testimony, several more murders occurred after these two. On July 20, 1991, Soto-Ramírez ordered the murder of one of his sellers at the Cuba Street drug point, Fernando Agosto-Villegas, because two-eighths of a kilogram of cocaine and a machine gun belonging to Soto-Ramírez were missing. On May 12, 1992, Soto-Beníquez ordered the murder of Heriberto Rivera-González in retribution for the death of Jose Cosme-Sobrado (a/k/a Canito), who had been managing several of Soto-Ramírez's drug points. Rivera-González was suspected of participating in the murder of Cosme-Sobrado earlier that day. Defendant Cintrón-Caraballo, cooperating government witness Negrón-Maldonado, and two other members of the group kidnapped Rivera-González and brought him to Callejón Dos, where Negrón-Maldonado and others killed him. Finally, on November 25, 1992, Negrón-Maldonado, Soto-Beníquez, and another co-conspirator not on trial here, Juan Antonio Rodríguez-López, killed Reynaldo Cancel-Robles. Soto-Beníquez supplied a drug dealer named "Cuelli," who owned a drug point outside Bitumul in the Vista Hermosa housing project.

Cancel-Robles was killed because he had ousted "Cuelli" from this drug point.

On December 20, 1992, gang warfare broke out between the group and members of a rival gang led by "Chacho." A shootout occurred between the two gangs, in which Angel Rivera-Pagán, a member of Soto-Ramírez and Soto-Beníquez's group, was killed. Eight days later, Negrón-Maldonado, Rodríguez-López, and others retaliated by murdering Roberto Vasallo-Morninglane, a member of the Chacho gang.

The gang warfare continued, and several days later, on January 10, 1993, defendant Vega-Pacheco, government witnesses Cesário-Soto and Negrón-Maldonado, Rodríguez-López, and others went to the Quintana housing project and killed five more people, two of whom were members of the Chacho gang. Vega-Pacheco later pled guilty in a Puerto Rico court to participating in those five murders, which came to be known as the Quintana massacre.

Yet another murder took place on March 7, 1993, when defendant Fernández-Malavé killed Tito Dones-Sanchez. Negrón-Maldonado and Cesário-Soto testified that Fernández-Malavé opened fire on a white van after Cintrón-Caraballo and other dealers at the Callejón Nueve drug point saw it driving nearby and suspected that those inside were members of the rival El Visco gang. Dones-Sanchez was later found dead inside a white van of the same description, which a municipal police officer had witnessed leaving

the Bitumul area.  Fernández-Malavé pled guilty in a Puerto Rico court to the murder of Dones-Sanchez.

While these murders were occurring in 1992 and 1993, some changes occurred in the leadership of the group.  On January 8, 1992, Soto-Ramírez was incarcerated after pleading guilty in a Puerto Rico court to various crimes, including attempted murder. After Soto-Beníquez was shot in an assassination attempt, he ceased activities in Bitumul in December 1992 and moved to Florida in 1993.  While Soto-Ramírez was in prison, Cosme-Sobrado managed three of Soto-Ramírez's drug points until Cosme-Sobrado was killed on May 12, 1992. Negrón-Maldonado then took over managing the points until he left for Philadelphia in June or July 1993.  When managing the points, both Cosme-Sobrado and Negrón-Maldonado took instructions from Soto-Ramírez through telephone calls from prison and forwarded the proceeds from the drug points to Soto-Ramírez's wife.

In June or July 1993, Rodríguez-López, a former member of the group, returned to Bitumul from Fajardo, where he had fled after the Quintana massacre.  Rodríguez-López had teamed up with defendant Rene Gonzalez-Ayala and government witness Torrens-Alicea to steal a two hundred kilogram shipment of cocaine at a beach in Fajardo.  Without consulting anyone in Bitumul, Rodríguez-López brought the cocaine back to Bitumul and established a "new" drug point at Callejón Nueve, where Soto-Ramírez's drug point had been

abandoned. Rodríguez-López employed several members of the original group in setting up the new drug point, including García-García and de León Maysonet, but he also brought in individuals from outside Bitumul, including Gonzalez-Ayala and Torrens-Alicea.

Tension arose between Rodríguez-López and the members of the original group, in particular Cintrón-Caraballo and Negrón-Maldonado, over the influx of outsiders working at the new drug point at Callejón Nueve. Torrens-Alicea testified, however, that after Negrón-Maldonado returned from Philadelphia, he "ironed out" these differences with Rodríguez-López over the course of two meetings in August or September 1993.

Around that time, several defendants again became involved in violent activities. According to Torrens-Alicea's testimony, on September 12, 1993, de León Maysonet, Gonzalez-Ayala, García-García, and three other members of the gang went to Fajardo to find and kill an individual named Vitito, who had been hired to kill those responsible for the stolen cocaine in Fajardo. They never found Vitito. Instead, de León Maysonet, Gonzalez-Ayala, and another member of the gang were arrested in Fajardo while in possession of a firearm and eleven decks of heroin; both de León Maysonet and Gonzalez-Ayala pled guilty in Puerto Rico court to the charges. On October 11, 1993, Torrens-Alicia, García-García, and two others killed Oscar Nazario-Rivera in Floral Park, Hato Rey,

-15-

because he was a member of the Chacho gang and had threatened Rodríguez-López.

## II.

On April 10, 1997, a federal grand jury in Puerto Rico returned a two-count indictment against the eleven appellants, along with ten other defendants. Count One charged Soto-Beníquez and Soto-Ramírez with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) and (b). Count Two charged that from about January 1, 1990, until about March 7, 1994, all twenty-one defendants conspired to distribute more than five kilograms of heroin, more than five kilograms of cocaine, more than five kilograms of cocaine base, and more than 100 kilograms of marijuana, as prohibited by 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846.

Rodríguez-López, who became a cooperating witness in the pre-trial stage of the case, testified to the grand jury. The government eventually discovered that he had lied before the grand jury about his presence at a murder. The government informed the grand jury about the false testimony, and on December 14, 1998, obtained a superseding indictment. In the superseding indictment, the government alleged the same charges against the same twenty-one defendants listed in the original indictment. The government also added Rodríguez-López as a defendant to the conspiracy charge of

the superseding indictment, thus raising the total number of defendants to twenty-two.

On December 28, 1998, the district court divided the twenty-two defendants into two groups for trial purposes.  At that point, sixteen of the original twenty-two defendants were slated to go to trial.  The district court selected the eleven appellants as the first group to be tried.  After an eighty-six-day trial, the jury returned a guilty verdict as to all eleven defendants on all counts for which they were charged.

All eleven defendants appealed.  This court consolidated their appeals.

## III.

### A.  Sufficiency of the Evidence Proving a Single Conspiracy (García-García, de León Maysonet, Gonzalez-Ayala)

To join a drug conspiracy, a defendant must agree with others to advance the aim of the conspiracy -- here, to possess drugs for distribution.  United States v. Garcia-Torres, 280 F.3d 1, 4 (1st Cir. 2002).  Advancing the aim of the conspiracy can involve performing ancillary functions such as processing and cooking drugs, procuring weapons, collecting monies, enforcing discipline, chastising rivals, accounting, and the like, as long as such actions are performed with the aim of furthering the conspiracy.  See id.  To hold that defendants have "joined" a conspiracy, there must be sufficient evidence both that they knew

-17-

about the conspiracy and that they knew the ancillary service would advance that conspiracy. Id.

Special issues arise when defendants argue that there were multiple conspiracies and that their activities were not part of the conspiracy charged. The initial issue -- and the only issue we need to reach here -- is whether the government proved the conspiracy charged in the indictment. This issue, assuming a properly instructed jury, resolves into a sufficiency-of-evidence question. United States v. Martinez-Medina, 279 F.3d 105, 113 & n.2 (1st Cir. 2002); United States v. Wihbey, 75 F.3d 761, 773-74 (1st Cir. 1996). If the evidence is sufficient to support the jury's finding that all the defendants are guilty of the single conspiracy charged, then no error has occurred.[1]

A number of factors come into play in determining whether the evidence establishes a single conspiracy,[2] including (1) the

---

[1]    If the evidence instead establishes agreements different from those charged, the next issue is variance. The reviewing court asks whether the evidence is sufficient to permit a properly instructed jury to convict the defendant of a similar related conspiracy, and if so, whether the variance between the two conspiracies affected the substantial rights of the defendant. United States v. Glenn, 828 F.2d 855, 858 (1st Cir. 1987); see also Kotteakos v. United States, 328 U.S. 750, 774 (1946). We need not reach this step of the inquiry in this case because we find sufficient evidence to support the finding of a single conspiracy.

[2]    In some cases, the indictment itself sets forth different, often sequential conspiracies in multiple counts. See, e.g., United States v. David, 940 F.2d 722 (1st Cir. 1991). Defendants then may argue that there is only one conspiracy, not two, and that they may not be sentenced for two conspiracies without violating the double jeopardy clause. Id. at 732. This

-18-

existence of a common purpose, such as selling drugs for profit, (2) the interdependency of various elements in the plan, such as whether the success of an individual's own drug transactions depends on the health and success of the drug trafficking network that supplies him, and (3) the degree of overlap among the participants. See Martinez-Medina, 279 F.3d at 114; United States v. Rivera-Ruiz, 244 F.3d 263, 268 (1st Cir. 2001); United States v. Portela, 167 F.3d 687, 697 (1st Cir. 1999). We look to the totality of the evidence to see if it supports a finding of a single conspiracy. Rivera-Ruiz, 244 F.3d at 268; Portela, 167 F.3d at 696. The government need not show that each conspirator knew of or had contact with all other members. Nor need it show that the conspirators knew all of the details of the conspiracy or participated in every act in furtherance of the conspiracy. United States v. Mena-Robles, 4 F.3d 1026, 1032 (1st Cir. 1993). Changes in the cast of characters do not preclude a finding of a single overarching conspiracy. United States v. Shea, 211 F.3d 658, 665 (1st Cir. 2000).

The defendants present two main challenges to the sufficiency of evidence proving a single conspiracy. First, they argue that there was no conspiracy at all because Soto-Ramírez and Soto-Beníquez were simply common distributors to a number of

court uses a similar totality of the circumstances, multi-factored approach in analyzing a claim of that type. Id. at 734.

diverse and independent drug points. This argument is belied by the record, which shows a great deal more than common distribution. The evidence establishes not only that Soto-Ramírez and Soto-Beníquez were the primary suppliers of the six drug points, but also that the six drug points shared a common system of defense. Various defendants stood guard at drug points owned by other co-conspirators to protect them from rival gang members. For example, Vega-Colón, who worked at his father's point on Laguna Street, also stood as an armed guard at Rodríguez-López's point on Callejón Nueve. Those standing guard at different drug points shared resources with each other. They communicated among themselves via walkie-talkies or radios, issuing alerts when the police or unfamiliar cars from outside Bitumul were in the area. They also shared rifles purchased and stored by Soto-Beníquez, and ammunition purchased by Vega-Cosme after taking up collections from each of the drug points. When the drug points were threatened by rival gangs, members of the group would join together to guard vulnerable points from attack. After the shootout with the Chacho gang in December 1992, Negrón-Maldonado, Fernández-Malavé, and Vega-Pacheco stood guard together at Callejón Dos. And after the conspiracy was threatened by members of the El Vizco gang, Soto-Beníquez, Negrón-Maldonado, Fernández-Malavé, and Cintrón-Caraballo stood guard together at the Street B drug point. The six drug points also negotiated as a group in settling disputes with rival gangs. When

war broke out against the Chacho gang at the end of 1992, Vega-Cosme met with Chacho to negotiate on behalf of all six drug points because the war was interfering with drug sales at the Bitumul points.

Furthermore, members of the group jointly avenged the deaths of others involved in the operation of the six drug points. After the death of Cosme-Sobrado, who managed Soto-Ramírez's drug points while he was in prison, members of the group met at Callejón Dos. Individuals from different drug points attended the meeting, including Soto-Beníquez and Alicea-Torres (Cuba Street point), Vega-Cosme and Vega-Colón (Laguna Street point), Cintrón-Caraballo (Street B point), and Negrón-Maldonado (Callejón Nueve point). As a result of the meeting, Negrón-Maldonado and Cintrón-Caraballo came together to kidnap and murder Rivera-González, whom Soto-Ramírez's wife suspected of participating in Cosme-Sobrado's murder.

In addition to this system of common defense, the co-conspirators had agreements regarding the distribution of narcotics at the drug points. Vega-Cosme and Negrón-Maldonado met at least three times to assign colors to the caps of crack capsules sold at different points in the Bitumul Ward so that their origin could be identified and competition between the points avoided. Vega-Cosme also asked Soto-Ramírez for permission before setting up his drug point with his son Vega-Colón on Laguna Street.

-21-

The evidence supports the jury's finding that each of the defendants joined in this common enterprise. First, the evidence establishes that each defendant joined in the common defense of the points. Seven of the defendants -- Soto-Ramírez, Soto-Beníquez, Alicea-Torres, Vega-Pacheco, Fernández-Malavé, García-García, and Cintrón-Caraballo -- ordered or participated in murders to protect the drug points. Soto-Ramírez and Alicea-Torres killed a police officer and a government informant who were about to discover the group's stash of weapons used to protect the drug points. Soto-Ramírez ordered the murder of one of his drug dealers when some cocaine and a machine gun disappeared, sending the message that those who broke ranks and stole from the group would be punished. See United States v. Rodríguez, 162 F.3d 135, 143 (1st Cir. 1998) (finding the beating of a member of the conspiracy suspected of being an informant to be in furtherance of the conspiracy because it served to "maintain[] discipline in [the conspiracy's] ranks"). On Soto-Beníquez's orders, Cintrón-Caraballo kidnapped Rivera-González and brought him to Bitumul to be killed to avenge the death of Cosme-Sobrado. Vega-Pacheco participated in the Quintana massacre to avenge the death of Rivera-Pagán, a member of the group. While defending the group's territory at Callejón Nueve, Fernández-Malavé killed Tito Dones-Sanchez by opening fire on a van suspected of containing rival gang members. García-García killed a member of the rival Chacho gang who threatened Rodríguez-López.

-22-

Although not direct participants in those murders, the remaining four defendants also contributed to the common defense of the drug points. We put aside, for the moment, the issue of whether the group's post-1993 activities involved a separate conspiracy. De León Maysonet and Gonzalez-Ayala went to Fajardo for the purpose of killing someone who threatened Rodríguez-López. Vega-Cosme supplied ammunition for shootings of rival gang members in 1992 and 1993 and negotiated on behalf of the group with the Chacho gang. Vega-Colón stood as an armed guard at Rodríguez-López's point on Callejón Nueve.

Second, in addition to evidence that each defendant participated in the system of common defense, there is evidence that each defendant participated in the common enterprise of selling drugs through the six points. We again put aside for the moment whether the group's post-1993 activities involved a separate conspiracy. Soto-Ramírez controlled several drug points, and his house was used to prepare and package crack and heroin for distribution at several of the drug points. Soto-Beníquez was the primary supplier of cocaine and crack to the six drug points. Alicea-Torres and Vega-Pacheco sold narcotics for points owned by Soto-Beníquez and Soto-Ramírez from 1990 to 1991. Fernández-Malavé packaged crack cocaine, cocaine, and heroin from 1992 to 1993, and packaged cocaine specifically for Soto-Ramírez from May 1992 to December 1992. García-García sold narcotics for Soto-Beníquez and

Soto-Ramírez from 1990 to 1991, packaged narcotics in 1992, returned to selling narcotics for Rodríguez-López in 1993. Cintrón-Caraballo supervised a drug point for crack cocaine and distributed cocaine and crack cocaine for Soto-Ramírez throughout the duration of the conspiracy. Gonzalez-Ayala helped Rodríguez-López steal 200 kilograms of cocaine for the conspiracy in 1993 and subsequently packaged and distributed it. De Leon-Maysonet packaged and stored narcotics for the conspiracy from 1990 to 1992 and then sold narcotics at the Callejón Nueve point in 1993. Vega-Cosme supplied ammunition and narcotics to Soto-Ramírez and distributed heroin at a drug point with Soto-Ramírez's permission throughout the duration of the conspiracy. Vega-Colón, Vega-Cosme's son, packaged crack, heroin, and marijuana for his father's point.

The second argument challenging the sufficiency of evidence proving a single conspiracy is presented by defendants García-García, de León Maysonet and Gonzalez-Ayala. They argue that the government overreached in counting as part of one massive conspiracy a separate, later, and antagonistic drug-selling group. The three defendants argue that they cannot be guilty of the continuing conspiracy when they were in competition with the original conspiracy and the original conspirators were out to kill the head of their drug group. They concede that the evidence does show their involvement with separate drug points. But the evidence

does not, they contend, show that they participated in an overall drug conspiracy headed by Soto-Beníquez and Soto-Ramírez. They argue that this conspiracy effectively ended by the summer of 1993. In January 1992, Soto-Ramírez was arrested and incarcerated. And William Soto-Beníquez, after escaping death in a shootout, ceased activities in Bitumul in December 1992 and moved to Florida in 1993. Cosme-Sobrado, who succeeded Soto-Ramírez, was killed on May 12, 1992, and Victor Negrón-Maldonado left for Philadelphia in June or July 1993.

The three defendants argue that later events centered around a separate conspiracy, led by Rodríguez-López. Rodríguez-López, who had originally been part of the conspiracy headed by Soto-Ramírez and Soto-Beníquez, left Bitumul for Fajardo in the summer of 1993 to avoid being arrested for his involvement in the Quintana massacre. While in Fajardo, he stole a 200 kilogram shipment of cocaine. Upon his return to San Juan in June or July of 1993, and without consulting anyone in Bitumul, Rodríguez-López reestablished a drug point at Callejón Nueve with the stolen cocaine, employing outsiders from Fajardo to operate the point. Negrón-Maldonado testified that while he was in Philadelphia, he had telephone conversations with people in Bitumul, including Cintrón-Caraballo, who wanted to kill Rodríguez-López for bringing outsiders into the Bitumul operation; Torrens-Alicea confirmed that

some members of the original group "were out to kill" Rodríguez-López.

Each of the three defendants argues that the multiple conspiracies theory affects his liability in a different way. Gonzalez-Ayala contends that, at most, he was a member only of a later uncharged conspiracy headed by Rodríguez-López; he did not join any conspiracy at all until the summer of 1993, when he helped Rodríguez-López steal the shipment of cocaine and returned with Rodríguez-López to set up the drug point at Callejón Nueve. Gonzalez-Ayala thus contends that no evidence ties him to the other Bitumul drug points or the earlier murders connected with those drug points.

De León Maysonet contends that he was prejudiced by the government's single conspiracy theory because all of his participation in the original conspiracy occurred while he was a minor. He was nonetheless held liable as an adult because he supposedly ratified the conspiracy by continuing to participate after he turned eighteen on January 12, 1992. United States v. Welch, 15 F.3d 1202, 1211-12 (1st Cir. 1993). He contends, however, that the only acts of ratification presented by the government occurred after the original conspiracy had ended and Rodríguez-López had taken over.

García-García argues that the government's presentation of a single overarching conspiracy, rather than multiple

conspiracies, subjected him to evidence of murders in which he did not participate. García-García contends that the only murder in which he allegedly participated -- that of Oscar Nazario-Rivera -- occurred after the original conspiracy ended and was not drug-related.

The jury was instructed on multiple conspiracies, at the request of the defense. The district court informed the jury that it must acquit "[e]ven if the evidence in the case shows that defendants were a member of some conspiracy, and not the single conspiracy charged in the indictment." As noted earlier, where the jury was properly instructed and found the defendants guilty of conspiracy, its verdict is reviewable only for sufficiency of evidence. David, 940 F.2d at 732.

On the evidence, a jury could have concluded that there was a later, rival conspiracy, but it was not compelled to do so. There is sufficient evidence to support the jury's verdict of guilt, as well as its implicit finding that a single conspiracy existed that extended through the summer of 1993. The jury could plausibly have found that Rodríguez-López was a member of the original conspiracy, that the reestablishment of the Callejón Nueve drug point in the small neighborhood of Bitumul was part of an agreed-upon general operation to sell drugs and to control the drug trade in Bitumul, that the tension among the members of the overarching group did not destroy the overall agreement, that those

tensions were worked out, and that the cooperation worked to everyone's benefit and continued to provide a system of common defense.

Government informant Luis Torrens-Alicea testified that differences between Rodríguez-López and the original Bitumul conspiracy were "ironed out" during two meetings involving Rodríguez-López, Negrón-Maldonado, and Cintrón-Caraballo at the El Trebol housing project in August or September of 1993.[3] Other evidence corroborates this account. Members of the original group continued to transact and meet with Rodríguez-López after his return. Negrón-Maldonado bought heroin on credit from Rodríguez-López on at least one occasion, and "cooked" crack cocaine for Rodríguez-López. "Peter," who managed Soto-Ramírez's point, Alicea-Torres, and Vega-Cosme all distributed kilograms of cocaine for Rodríguez-López after his return. On September 12, 1993, García-García, de León Maysonet, and two other members of the original Bitumul group joined together with newcomers Gonzalez-Ayala and Torrens-Alicea to find and kill Vitito, who had been hired to kill those who had stolen the 200 kilogram shipment of cocaine in Fajardo. Furthermore, after Rodríguez-López's return,

_____

[3] Torrens-Alicea also testified that, at this meeting, Cintrón-Caraballo and Negrón-Maldonado informed Rodríguez-López that they now sought to kill Soto-Ramírez and his associates. Because Soto-Ramírez and Soto-Beníquez had already left Bitumul at this point, however, these new tensions did not prevent the drug points from working together, as described infra.

Soto-Ramírez, Vega-Cosme, Cintrón-Caraballo, and Negrón-Maldonado all continued to operate the same drug points, and García-García, de León Maysonet, Alicea-Torres, Fernández-Malavé, and two other members of the original conspiracy continued to work at those points.

Moreover, contrary to defendants' assertions that the drug points operated independently after the summer of 1993, the evidence permitted the conclusion that they continued to work together. Negrón-Maldonado's three meetings with Vega-Cosme to coordinate the cap colors for crack capsules occurred between September and November of 1993, three to five months after Rodríguez-López's return. In addition, members of the conspiracy acted jointly to defend each other from threats. Vega-Cosme continued to purchase ammunition for the collective defense of the drug points. On September 12, 1993, as mentioned earlier, members of the original Bitumul group joined with the newcomers to find and kill Vitito, who had been hired to kill Rodríguez-López and others. On October 11, 1993, Torrens-Alicea, García-García, and two other individuals murdered Oscar Nazario-Rivera, a member of the rival Chacho gang who had threatened Rodríguez-López. Members of the conspiracy also continued to warn one another about possible threats. In 1994, after Vega-Cosme's drug point was shot at by individuals from San Jose, he went to Cintrón-Caraballo and Negrón-Maldonado to warn them of the danger. And on several occasions in

early 1994, after Alberto Santiago-Figueroa, who ran the El Palo point on Laguna Street, saw people armed with rifles driving by his point, he sent a messenger to inform Negrón-Maldonado of what he had seen.

Because the record supports the jury's finding of a single conspiracy, the three defendants are liable for their participation. Although Gonzalez-Ayala may have joined the conspiracy late, as long as he did so knowingly, he is liable for the conspiracy itself and earlier acts in furtherance of the conspiracy. David, 940 F.2d at 735. A jury could easily have found that he joined knowingly. Gonzalez-Ayala was present at the meeting of Negrón-Maldonado, Cintrón-Caraballo, and Rodríguez-López in August or September of 1993, in which they worked out their differences. He also participated in the trip to Fajardo to kill Vitito. Mere association with conspirators does not establish a knowing intent to join a conspiracy. United States v. Gomez-Pabon, 911 F.2d 847, 853 (1st Cir. 1990). But, in this situation, the jury could have reasonably inferred from Gonzalez-Ayala's presence at negotiations between major players in the gang and from his participation in the hunt for Vitito that he knew or learned of "the essential nature of the plan" to distribute narcotics in Bitumul and the violent tactics used to carry out that distribution. Mena-Robles, 4 F.3d at 1032 (quoting United States v. O'Campo, 973 F.2d 1015, 1019 (1st Cir. 1992)).

-30-

Similarly, although de León Maysonet joined the conspiracy as a minor, he ratified his participation after he had turned eighteen. In 1993, he stood guard at the Callejón Nueve point, packaged and stored narcotics for the point, and participated in the unsuccessful mission to Fajardo in 1993 to find and kill Vitito.

García-García actively participated in the conspiracy from the beginning, selling drugs at the Cuba Street point from 1990 to 1991 and packaging narcotics for drug points from 1992 to 1993.

We reject the defendants' multiple conspiracies arguments.

## B. Pre-Trial

### 1. Grand Jury Misconduct
(Soto-Beníquez, Soto-Ramírez, Fernández-Malavé)[4]

One event concerning a grand jury witness underlies a number of issues presented by the defense.

The government used a then-cooperating conspirator, Rodríguez-López, as a grand jury witness in obtaining the original indictment on April 10, 1997. In July of 1998, the prosecution first learned that it might have been misled by Rodríguez-López.

---

[4] A number of defendants present no argument on issues but purport to adopt arguments presented by other defendants on those issues. In no instance in which that is done is the argument successful. When an issue is listed as raised by a defendant, the defendant listed is the one who argued the issue.

Negrón-Maldonado, who had just started cooperating with federal authorities, informed the prosecution that Rodríguez-López was not, as he had told the prosecution, present at Rivera-González's murder. When confronted with this information, Rodríguez-López admitted that he had lied to FBI investigators about being present at the murder but insisted that he had not fabricated any of his testimony before the grand jury, which did not address the Rivera-González murder.

Rather than disclose this information immediately, the prosecution waited and investigated. In November 1998, the government learned from a second cooperating defendant that Rodríguez-López also might have lied about his presence at several other murders, including at least one murder about which he had testified to the grand jury, that of Rivera-Pagán. On November 18, the government notified defense counsel of this inconsistency. It also insisted that Rodríguez-López, who still denied lying to the grand jury, take a polygraph test. When he failed the test on December 1, Rodríguez-López admitted that he had indeed lied during the grand jury proceedings and that he had not been present at Rivera-Pagán's murder. On December 14, the prosecution obtained a superseding indictment from the grand jury that changed Rodríguez-López from a star government witness to a defendant. The superseding indictment, which was returned 15 days before trial started, was based on the testimony of a federal agent who

presented the government's evidence that Rodríguez-López had lied to the FBI. Rodríguez-López did not testify at trial.

Several defendants object that their convictions were irreparably tainted by Rodríguez-López's perjury before the grand jury. The trial court rejected this claim, holding that the fact that the superseding indictment was obtained and the perjured testimony was not presented at trial cured any problem. That ruling was correct.

The unknowing presentation of perjured testimony before the grand jury was harmless and does not warrant any remedial action. "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988); see also United States v. Flores-Rivera, 56 F.3d 319, 328 (1st Cir. 1995). Here, the district court specifically found that "[d]efendants can hardly show prejudice when the matter was later explained to the Grand Jury and the perjured testimony has not been used in trial." We review this conclusion only for an abuse of discretion. See United States v. Maceo, 873 F.2d 1, 3 (1st Cir.), cert. denied, 493 U.S. 840 (1989). No such abuse was present here.

First, the grand jury returned a superseding indictment after learning of the perjured testimony, thereby demonstrating

that sufficient evidence existed to indict the defendants even absent the testimony of Rodríguez-López.

Of even greater import, a petit jury subsequently found the defendants guilty beyond a reasonable doubt of the charges alleged in the indictment. Such a finding "demonstrates a fortiori that there was probable cause to charge the defendants with the offenses for which they were convicted." United States v. Lopez-Lopez, 282 F.3d 1, 9 (1st Cir. 2002) (quoting United States v. Mechanik, 475 U.S. 66, 67 (1986)). As such, "[a]ll but the most serious errors before the grand jury are rendered harmless by a conviction at trial." United States v. Reyes-Echevarria, No. 02-1653, 2003 U.S. App. LEXIS 19614, at *6 (1st Cir. Sept. 22, 2003). "Only a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment" is sufficient to invalidate a subsequent conviction. Id. (quoting Midland Asphalt Corp. v. United States, 489 U.S. 794, 802 (1989)). The government's unknowing presentation of perjured testimony before the grand jury is not a defect of that magnitude on these facts.

2. Indictment

    a) Pre-Indictment Delay
       (Soto-Beníquez, Soto-Ramírez)

Soto-Beníquez and Soto-Ramírez argue that the indictment should have been dismissed because the government delayed in obtaining it. As discussed infra, the indictment complied with the

statute of limitations, which is the primary safeguard against pre-indictment delay.  When the statute of limitations has been met, a defendant seeking reversal of his conviction based on pre-indictment delay "bears the heavy burden of showing not only that the pre-indictment delay caused him actual, substantial prejudice, but also that the prosecution orchestrated the delay to gain a tactical advantage over him."  United States v. Stokes, 124 F.3d 39, 46-47 (1st Cir. 1997); see also United States v. Marion, 404 U.S. 307, 324 (1971).  Soto-Beníquez and Soto-Ramírez have not attempted to make such a showing.

> b)  Constitutionality of CCE Indictment
>       (Soto-Beníquez, Soto-Ramírez)

>       i.  Failure to Charge Three Predicate CCE Acts

Soto-Beníquez and Soto-Ramírez argue that their CCE convictions should be reversed because the indictment did not set forth as elements of the offense the three predicate offenses required for the crime of CCE, 21 U.S.C. § 848.  As described in our case law, the elements of a CCE crime are (1) the defendant committed a felony violation of the federal narcotics laws, (2) the violation was part of a continuing series of violations, (3) the series of offenses occurred in concert with five or more persons, (4) the defendant was an organizer, supervisor, or manager, and (5) the defendant obtained substantial income or resources from the series of violations.  United States v. Rouleau, 894 F.2d 13, 14

-35-

(1st Cir. 1990). To show a continuing series of violations, three or more predicate drug offenses must be demonstrated. Id.

Defendants argue that their due process rights were violated because they were deprived of adequate notice of the predicate offenses underlying the CCE charge. Where the CCE count of an indictment does not list the specific predicate offenses but those offenses are alleged in other counts of the indictment, courts have generally held that defendants have received actual notice of the charges and no reversible error has occurred. United States v. Staggs, 881 F.2d 1527, 1530-31 (10th Cir. 1989) (finding indictment adequate where no underlying violations were specified in the CCE count but at least three underlying violations were listed elsewhere in the indictment); United States v. Moya-Gomez, 860 F.2d 706, 752 (7th Cir. 1988); United States v. Becton, 751 F.2d 250, 256-57 (8th Cir. 1984). We think it preferable for predicate offenses to be alleged in the CCE count. But, at least where the CCE count incorporates by reference predicate offenses charged elsewhere in the indictment, failure to list predicate offenses in the CCE count itself is not reversible error because the defendant has been provided fair notice. Moya-Gomez, 860 F.2d at 752; Becton, 751 F.2d at 256-57.

Here, while the CCE count did not explicitly set forth three CCE predicate offenses, it incorporated Count Two, the conspiracy count. Count Two did provide such notice. Count Two

states that "at divers times" between January 1, 1990 and March 7, 1994, the defendants distributed and possessed with intent to distribute heroin, cocaine, crack cocaine, and marijuana. It further states that the defendants "would purchase multi-kilogram quantities of heroin, cocaine and marijuana at wholesale prices, . . . would cut, divide, and package [the drugs] in small packages for subsequent sale at drug points, [and] . . . would sell packaged [drugs] in small quantities to customers at drug points." That count also alleges specifically that Soto-Ramírez and Soto-Beníquez supervised the "supply [of] sellers with the drugs to be sold . . . and [the sale of] narcotics at drug point," and that they would "personally deliver packaged narcotics to [their] runners and sellers."

Defendants argue (1) that the acts described in Count Two are insufficient to provide notice because they establish only one predicate offense, namely, the conspiracy to distribute narcotics,[5] and (2) that the acts are insufficiently described. Both assertions are incorrect. As to the defendants' first contention, each act of distribution described in the indictment constitutes a separate predicate offense. See, e.g., United States v. Escobar-de

---

[5]     If the conspiracy is used to establish the continuing series of violations, then defendants may be punished on the CCE charge but not the conspiracy charge. Rutledge v. United States, 517 U.S. 292, 307 (1996). Because the court eventually dismissed the conspiracy charge, Count Two, against the two CCE defendants, this is not an issue here.

Jesús, 187 F.3d 148, 160 n.6 (1st Cir. 1999) (treating two different incidents of possession with the intent to distribute as two separate predicate offenses).  Multiple acts of distribution, certainly three or more, are alleged.  As to their second contention, the time period and acts are alleged in sufficient detail to provide adequate notice.

Defendants then argue that the indictment failed to specify either the amount of drugs distributed or the amount of "substantial income" received by the defendants, thus depriving them of notice as to whether they were charged under 21 U.S.C. § 848(a) or (b).  Section 848(a) carries a sentence of thirty years to life, whereas § 848(b) carries a mandatory life sentence.  We reject defendants' argument.  Defendants, merely by reading the indictment, were on notice of the possibility of a life sentence.  Section 848(b) requires life imprisonment for the "principal . . . leaders" of the continuing criminal enterprise if their violation of the drug laws involved more than 300 times the quantity described in 21 U.S.C. § 841(b)(1)(B).  The indictment identified Soto-Ramírez and Soto-Beníquez as the two "leader[s] . . . of the drug-trafficking organization described in Counts One and Two."  It also identified them as conspiring to distribute, inter alia, more than five kilograms of cocaine base, which is more than 300 times the five grams of cocaine base described in § 841(b)(1)(B).

Defendants also argue that in the indictment the predicate offenses for the CCE charge were based on the conspiracy count, but at trial, the government used evidence of uncharged narcotics offenses to establish the predicate offenses. Thus, defendants argue, although the CCE charge remained the same, the facts used to prove the series element of the charge were different from those set forth in the indictment.

Defendants frame this argument as a claim of constructive amendment, but it is actually a claim of variance. "A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them. A variance occurs when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment." United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993) (citations and quotation marks omitted). Convictions may be reversed based on variance only upon a showing of prejudice to the defendant's substantial rights -- that is, when lack of notice regarding the charges deprives the defendant of his ability to prepare an effective defense and to avoid surprise at trial. Id. Here, defendants were not prejudiced. The indictment charged them with violations of narcotics laws from January 1990 to March 1994; the use of narcotics offenses in that time period should have been no surprise to them.

ii. CCE Prosecution As Contrary to Congressional Intent

Soto-Beníquez and Soto-Ramírez next argue that their prosecution under the CCE statute is contrary to legislative intent. That intent, they contend, is to enhance punishment for large-scale drug kingpins. Defendants argue that the evidence did not show them to be kingpins because they lived modestly. The government argues that we should not entertain this argument because the crime charged is within the statutory language and that ends the inquiry. If the crime charged is literally within the words of the statute, there is not usually occasion to inquire into intent. See United States v. Rutherford, 442 U.S. 544, 551 (1979). That is the case here.

To the extent that defendants' argument challenges the sufficiency of evidence as to the substantial income element of the CCE charge, it fails. Soto-Beníquez sold at least $10,000 worth of cocaine per week to Negrón-Maldonado. Soto-Ramírez owned three drug points for at least three years, each of which yielded approximately $5,000 per week from crack cocaine alone. These figures provide sufficient evidence to support the jury's finding of substantial income.

c) Statute of Limitations
(Soto-Beníquez, Soto-Ramírez)

Soto-Beníquez and Soto-Ramírez argue that their prosecution was untimely under the statute of limitations. A CCE

offense consists of a series of three or more underlying predicate offenses. A CCE charge is within the statute of limitations if the government demonstrates that at least one predicate act was committed in the five years prior to the indictment. See, e.g., United States v. Baker, 10 F.3d 1374, 1410 (9th Cir. 1993). In this case, the indictment is dated April 11, 1997. Thus, the prosecution had to prove that one predicate act was committed on or after April 12, 1992.

The parties dispute which acts count as predicate offenses for purposes of determining whether the statute of limitations has run. Soto-Beníquez and Soto-Ramírez argue, by analogy to the RICO statute, that only the acts of the parties charged with the CCE count, and not those of their co-conspirators, may be considered. See United States v. Torres-Lopez, 851 F.2d 520, 524-25 (1st Cir. 1988) (applying this rule to substantive RICO charges). The government argues that it need only demonstrate that acts in furtherance of the conspiracy occurred within the five-year limitations period and that the defendants failed to withdraw from the conspiracy.

We need not resolve this issue because the evidence, viewed in the light most favorable to the prosecution, is sufficient to support the conclusion that both Soto-Ramírez and Soto-Beníquez themselves committed predicate offenses after April 12, 1992. Although Soto-Ramírez was incarcerated on January 8,

1992, the government presented evidence that he still controlled and managed the drug points at La Pared, Callejón Nueve, and Cuba Street. While he was in prison, he employed Cosme-Sobrado to manage the points until May 1992. After Cosme-Sobrado was killed, Soto-Ramírez appointed "Manolín" and "Peter" as Cosme-Sobrado's successors. Soto-Ramírez gave instructions on the operation of the points by telephone, and the proceeds from the points were given to Soto-Ramírez's wife. This evidence of Soto-Ramírez's own acts within the five-year period is sufficient to establish the timeliness of his indictment.

Soto-Beníquez argues that he ceased all activities related to the conspiracy in December 1992 when he moved to Florida. Assuming arguendo that this statement is true, the December 1992 date does not help Soto-Beníquez. The operative date for limitations purposes is April 12, 1992, some eight months earlier. The record supports the conclusion that Soto-Beníquez engaged in predicate offenses after that date. In January 1993, for example, Soto-Beníquez provided transportation, firearms, and a hide-out for members of the Bitumul gang after the Quintana massacre, in which the gang murdered five people in retaliation for the death of fellow gang member Rivera-Pagán. Soto-Beníquez's indictment was not barred by the statute of limitations.

3. Abuse of Prosecutorial Discretion
   (Fernández-Malavé)

Fernández-Malavé makes a generalized protest that the federal prosecution should never have been brought because he (and many of the other defendants) had already pled guilty to related state charges. This argument does not present an issue that is reviewable by this court. Whatever the contours of permissible attacks on the exercise of prosecutorial discretion, this claim lies outside of those contours. See United States v. Stokes, 124 F.3d 39, 45 (1st Cir. 1997) ("[T]he federal government [has] a perfect right to take a hard look at [a] case and to determine whether society's interests call for the unusual step of instituting a federal prosecution notwithstanding the prior commencement of a state prosecution for substantially the same conduct.").

4. Pre-Trial Denial of Motions for Severance
   (Gonzalez-Ayala, de León Maysonet)

Gonzalez-Ayala and de León Maysonet appeal from the district court's denial of their motions to be severed and tried with the second group of defendants. On December 28, 1998, the day on which jury selection began, the district court decided to split the sixteen defendants who planned to go to trial into two groups. The government proposed that the first ten defendants on the indictment become the first group to go to trial. The government's reasoning was that this division would allow the prosecution to

"try[] the senior conspirators together, that is the principal leaders, and the organizers and supervisors of the conspiracy" and to "try[] the conspirators who planned and carried [out] numerous acts of violence within the conspiracy together." The district court initially accepted this proposal but then severed one defendant to allow for a mental competency hearing, another defendant because he was on bond, and yet another defendant because his counsel withdrew from the case on that day. Two other defendants were severed because they could not yet proceed to trial; one was still a fugitive and the other, Rodríguez-López, had been indicted only two weeks earlier. Having severed five defendants, the district court was left with the eleven appellants and decided to proceed to trial with all eleven.

Gonzalez-Ayala and de León Maysonet contend that the district court erred in refusing to sever their cases. Rule 14, Fed. R. Crim. P., allows a trial court to sever defendants when joinder would prejudice them. Gonzalez-Ayala and de León Maysonet argue that the joinder prejudiced them by forcing them to go to trial with more senior conspirators. They contend that the complexity of the case and the markedly different degrees of culpability between them and their co-defendants, many of whom committed murders or held leadership positions in the conspiracy, created the potential for jury confusion. Moreover, they argue that they were prejudiced by the presentation of spillover evidence

-44-

regarding fifteen murders committed by their co-defendants, in which they did not participate.

We review the district court's denial of defendants' motions for severance under Fed. R. Crim. P. 14 for abuse of discretion. United States v. Lane, 474 U.S. 438, 449 n.12 (1986); United States v. DeLuca, 137 F.3d 24, 36 (1st Cir. 1998). To demonstrate abuse of discretion, defendants must show that joinder deprived them of a fair trial, resulting in a miscarriage of justice. United States v. Baltas, 236 F.3d 27, 33 (1st Cir. 2001). Because the general rule is that those indicted together are tried together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources, severance is particularly difficult to obtain where, as here, multiple defendants share a single indictment. United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993).

Defendants have not made such a strong showing of prejudice. As to the murder evidence, defendants cannot complain of an improper spillover effect where evidence is independently admissible against them. United States v. Brandon, 17 F.3d 409, 440 (1st Cir. 1994); O'Bryant, 998 F.2d at 26. Because conspiracy cases often involve evidence that is admissible against all members of the conspiracy, "in the context of conspiracy, severance will rarely, if ever, be required." DeLuca, 137 F.3d at 36 (quoting Flores-Rivera, 56 F.3d at 325 (internal quotation marks and

-45-

citations omitted)).  Here, the murder evidence would likely be admissible against Gonzalez-Ayala and de León Maysonet even in a separate trial in order to demonstrate the operation and development of the conspiracy's system of common defense.

As to the complexity of the case and the potential for jury confusion, there is no indication that the jury was unable to distinguish the evidence and acts relating to each defendant.  The court instructed the jury that each defendant must be judged separately based on the evidence admissible against him. Defendants are not entitled to severance solely on the basis that their co-defendants were more culpable.  See Flores-Rivera, 56 F.3d at 325; Brandon, 17 F.3d at 440-41.

5.   Pre-Trial Discovery
     (Soto-Beníquez, Soto-Ramírez, Fernández-Malavé, Alicea-Torres)

Defendants make both a generalized attack on the government's habitual dilatoriness in turning over discovery material and more specific attacks.  Here, we address only the alleged lateness of the prosecution's compliance with discovery; the Brady and Giglio claims are dealt with later, as are the specific attacks.

Several of the defendants allege that the prosecution consistently failed to respond to discovery requests and orders in a timely fashion, and then "smother[ed] [them] with an avalanche of documents during trial."  The defendants are correct that the

-46-

prosecution did, on several occasions, fail to comply with discovery timetables set by the district court. These discovery violations do not warrant reversing the defendants' convictions.

We have long recognized that "the decision as to whether discovery sanctions are warranted and the choice of what sanctions should be imposed are matters within the sound discretion of the trial court." Gannett v. Carp (In re Carp), 340 F.3d 15, 23 (1st Cir. 2003); Media Duplication Servs., Ltd. v. HDG Software, Inc., 928 F.2d 1228, 1238 (1st Cir. 1991). As such, review of a district court's use or non-use of discovery sanctions is only for abuse of discretion. See United States v. One 1987 BMW 325, 985 F.2d 655, 657 (1st Cir. 1993). An abuse of discretion "occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." Indep. Oil & Chem. Workers, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988).

The district court did not abuse its discretion in refusing to dismiss the indictment due to the prosecution's discovery violations. Rather than resort to the drastic remedy of dismissal, the district court wisely addressed the prosecution's failures to comply with discovery deadlines on a situation-by-situation basis in order to prevent or remedy any prejudice that those violations may have had on the defendants. Cf. United States

v. Santana, 6 F.3d 1, 11 (1st Cir. 1993) (suggesting that a court should not dismiss an indictment when prosecutorial misconduct is "redressable through the utilization of less drastic disciplinary tools"). For instance, in response to the government's failure to comply with one discovery order, the district court chastised the prosecution and ordered the government to provide the defendants with information not normally covered by Rule 16 of the Federal Rules of Criminal Procedure. Addressing another violation, the district court set an accelerated discovery timetable and warned the prosecution that "[i]f the government fails to comply, the court will dismiss the indictment." In a third instance, the court refused to admit into evidence a photograph that the prosecution had not adequately disclosed to the defense. Each of these responses to the government's discovery violations helped mitigate any prejudice to the defendants that might otherwise have resulted from the government's apparent inability to meet discovery deadlines. Given this solution, the district court's continual denials of the defendants' motions to dismiss the indictment due to the government's discovery violations were certainly not abuses of discretion. That conclusion is not a condonation of the government's behavior; it is just a recognition that reversal of the conviction is not warranted, given the district court's imposition of other sanctions.

## C. Alleged Trial Errors

### 1. Evidentiary Rulings

#### a) Admission of Murder Evidence As to CCE Defendants (Soto-Beníquez, Soto-Ramírez)

Soto-Beníquez and Soto-Ramírez object that they were unfairly prejudiced by the admission of evidence concerning the murders of Jose Cosme-Sobrado, Angel Rivera-Pagán, and Miguel Angel Millan-Soto (a/k/a Guelo). The district court found that the three murders were not part of the conspiracy, but admitted the evidence over the defendants' Rule 403 objection because the three murders explained the motive for subsequent murders that did further the conspiracy.

The district court's ruling is reviewed for abuse of discretion. Old Chief v. United States, 519 U.S. 172, 183 n.7 (1997). The court did not abuse its discretion in admitting the evidence. Cosme-Sobrado's murder was relevant to demonstrate a motive for an overt act in furtherance of the conspiracy: the kidnapping and murder of Herberto Rivera-González. Members of the conspiracy killed Rivera-González because he was a suspected participant in Cosme-Sobrado's murder. Cosme-Sobrado's death was also important to demonstrate that conspirators from different drug points would come together to avenge the death of a member of their gang. Similarly, the killings of Rivera-Pagán and Millan-Soto in shootings by the Chacho gang were relevant to demonstrate the basis for gang warfare with Chacho. This gang warfare led to two overt

acts in furtherance of the conspiracy: the murder of Roberto Vasallo-Morninglane, who was a member of the Chacho gang, and the Quintana massacre.

Soto-Ramírez and Soto-Beníquez also claim, without further explanation, that they were prejudiced by evidence of twelve other murders. Because this argument is made in a perfunctory manner, unaccompanied by any effort at developed argumentation, it has been waived. See Grella v. Salem Five Cent Sav. Bank, 42 F.3d 26, 36 (1st Cir. 1994).

b) Admission of Murder Evidence As to Non-CCE Defendants
(García-García, Gonzalez-Ayala, de León Maysonet)

Three defendants contend that evidence of murders should not have been admitted against them because the government did not establish a connection between any of the murders and the charged conspiracy. They argue that the murders were not shown to be in furtherance of the charged conspiracy. They also argue that even if the murders were in furtherance of a conspiracy headed by Soto-Ramírez and Soto-Beníquez from 1990 until the summer of 1993, those murders did not advance the interests of the later conspiracy headed by Rodríguez-López. These errors regarding the admission of the murder evidence, they contend, cannot be harmless because the murders constituted about seventy-five percent of the government's evidence at trial.

Review is for abuse of discretion. No abuse occurred here. The three murders discussed in the previous section were admissible to demonstrate the motive for subsequent overt acts in furtherance of the conspiracy. The remaining murders were admissible as acts in furtherance of the conspiracy.

A reasonable factfinder could infer that the murder of Dagoberto Robles-Rodríguez was in furtherance of the conspiracy. Soto-Ramírez and Soto-Beníquez worked for Robles-Rodríguez, who owned the drug point on Cuba Street, at the time of the murder. Negrón-Maldonado testified that Soto-Ramírez teamed up with co-conspirators Cosme-Vega and "Manolín" and killed Robles-Rodríguez at least partly because Soto-Ramírez felt threatened by him. Afterwards, Soto-Ramírez and Soto-Beníquez took control of Robles-Rodríguez's drug point. A reasonable inference is that Soto-Ramírez killed Robles-Rodríguez to avoid further threats and to gain full control of the drug point, thus eliminating a potential competitor to the conspiracy.

It is also a reasonable inference that government informant Ana Luz Dones-Arroyo and undercover police officer Efrain Hernández de León were killed in furtherance of the conspiracy -- to prevent their discovery of the group's weapons stash. The two were gunned down as Dones-Arroyo was leading the officer to the location of the stash.

Fernando Agosto-Villegas was killed on Soto-Ramírez's orders because two-eighths of a kilogram of cocaine and a machine gun belonging to Soto-Ramírez were missing. The murder furthered the conspiracy by sending the message that those suspected of stealing from the conspiracy would be treated harshly. Rodríguez, 162 F.3d at 143.

Herberto Rivera-González was killed in retribution for the death of Cosme-Sobrado, who had been managing Soto-Ramírez's drug point for him while he was in prison. The defendants correctly note that the government never proved that Rivera-González was actually a member of a rival gang or participated in killing Cosme-Sobrado. But the government met its burden when it presented testimony that the conspirators believed, even if incorrectly, that Rivera-González was responsible and that they killed him for that reason. See, e.g., United States v. Mayes, 917 F.2d 457, 464 (10th Cir. 1990) (explaining that to be "in furtherance" of a conspiracy, an act must be intended to promote conspiratorial objectives but need not actually succeed in furthering the conspiracy).

Reynaldo Cancel-Robles was killed because he seized control of a drug point located outside Bitumul in the Vista Hermosa housing project that was supplied by Soto-Beníquez. His murder furthered the conspiracy by protecting its customer base and thus ensuring a stronger market for its narcotics.

Robert Vasallo-Morninglane and the five victims of the Quintana Massacre were killed in retribution for the death of Angel Rivera-Pagán. Rivera-Pagán had died in a shootout in Bitumul with the rival Chacho gang, to which Vasallo-Morninglane and two of the five victims of the Quintana Massacre belonged. These murders furthered the conspiracy's goal of defending its territory and its members against rival drug-trafficking organizations.

Tito Dones-Sanchez was killed while riding in a van near the drug point at Callejón Nueve. Fernández-Malavé spotted the van and opened fire on it, believing that those inside were members of a rival gang who intended to threaten the drug point. Dones-Sanchez was murdered to protect the drug territory at Callejón Nueve, and thus to further the goals of the conspiracy.

Oscar Nazario-Rivera was killed because he was a member of the rival Chacho gang and had fired shots at Rodríguez-López in the past. His murder furthered the conspiracy by eliminating a possible threat to one of its major players, Rodríguez-López. Cf. United States v. Nesser, 939 F. Supp. 417, 421 (W.D. Pa. 1996) ("Hiding information about the leader of a drug conspiracy [in order to protect him] is another way to further its purpose, by allowing it to continue.").

We also reject defendants' argument that these murders furthered a separate conspiracy from the one in which they participated. As discussed above, the record supports the jury's

finding that a single conspiracy existed and that the three defendants were part of it.

Because evidence of all fifteen murders was admissible to demonstrate the existence of a conspiracy, it was admissible against these three defendants. Defendants correctly note that the record establishes that García-García participated in only one murder, that Gonzalez-Ayala and de León Maysonet participated in no murders, and that most of the murders occurred before Gonzalez-Ayala joined the conspiracy and before de León Maysonet turned eighteen. But, as discussed earlier, the three defendants are liable for conspiracy. As a result, they are liable for acts in furtherance of the conspiracy, even if they did not participate in those acts and even if those acts occurred before they joined the conspiracy.

        c)    Admission of Guilty Pleas
              (Fernández-Malavé, Gonzalez-Ayala, de León Maysonet)

The district court admitted into evidence Fernández-Malavé's guilty plea to the murder of Tito Dones-Sanchez over defense counsel's objection that the plea was not knowing and voluntary.[6] According to Fernández-Malavé, his plea in Puerto Rico

---

[6]     Fernández-Malavé also asserts in his brief a different objection to the admission of his guilty plea, rooted in Fed. R. Evid. 403. Because this objection was not raised below, the court's decision not to exclude the evidence on Rule 403 grounds is reviewed for plain error. See United States v. Woods, 210 F.3d 70, 78 (1st Cir. 2000). Given the relevance of the murder of Dones-Sanchez to the charged conspiracy, it is clear that there was not plain error in admitting the guilty plea despite potential Rule 403

court was coerced because the local prosecutor had falsely represented to him that the earlier testimony of an unavailable witness could be used against him at trial. After hearing lengthy argument on this issue, the district court denied Fernández-Malavé's motion, concluding that Fernández-Malavé knowingly pled guilty in order to avoid facing first-degree murder charges.

Normally, it is inappropriate for a federal court to review a collateral attack on a state court conviction without affording the state court a prior opportunity to do so. United States v. Bouthot, 878 F.2d 1506, 1511 (1st Cir. 1989). But when a defendant challenges the voluntariness of a state court guilty plea for purposes of an admissibility determination, the interests of comity and federalism that underlie the exhaustion doctrine are best served by addressing the merits of that claim. Id.; see United States v. Campusano, 947 F.2d 1, 4-5 (1st Cir. 1991). We thus review the district court's evidentiary ruling for abuse of discretion. United States v. Perrotta, 289 F.3d 155, 164 (1st Cir. 2002).

The district court had a more than sufficient basis upon which to deny Fernández-Malavé's motion to exclude his guilty plea. The court noted that "counsel for the defendant described exactly what the plea was" during the plea colloquy in state court and that

---

concerns: the murder was highly probative of a material issue in the case.

Fernández-Malavé expressly told the court that he had discussed his options with his lawyer and was pleading guilty freely and voluntarily. Furthermore, the court concluded that the Puerto Rico prosecutor did not mislead Fernández-Malavé about the admissibility of the unavailable witness's prior testimony, but was instead simply advocating a plausible interpretation of the Puerto Rico evidence rules. Fernández-Malavé has not presented any reason to doubt these findings.

De León Maysonet and Gonzalez-Ayala also object to the district court's admission of their plea agreements regarding state crimes; de León Maysonet had pled guilty to possessing a controlled substance, while Gonzalez-Ayala had pled guilty to conspiring or attempting to violate the Puerto Rico controlled substances law. The argument of these defendants differs slightly from that of Fernández-Malavé: they claim that the plea agreements were not admissible because the government did not enter in evidence a transcript of their plea colloquies in Puerto Rico court. Gonzalez-Ayala also argues that his plea should not have been admitted because the crime to which he pled encompasses numerous types of criminal activity, making it impossible for the jury to determine the activities for which he was actually convicted.[7]

---

[7] The defendants also argue briefly that the convictions were inadmissible hearsay because they did not fall within Rule 803(22). This argument is not developed in the defendants' brief, and, in any case, is not meritorious. See Fed. R. Evid. 803(22) (exception to hearsay rule for "[e]vidence of a final judgment,

The district court had a sufficient basis to reject these arguments as well. Even without the transcript of the plea colloquy, the pleas linked the defendants to the charged drug conspiracy: according to the arresting officer, both Gonzalez-Ayala and de León Maysonet possessed heroin and a firearm when they were arrested. Had the defendants produced specific evidence that the guilty pleas were coerced, the admissibility of the pleas might be questionable. But defendants cannot defeat the relevance of these guilty pleas by making unsupported allegations that they were not voluntary.

For similar reasons, we reject Gonzalez-Ayala's argument that his plea should not have been admitted because the statute to which he pled guilty applied to more than one factual scenario. The guilty plea corroborated the fact that Gonzalez-Ayala was found carrying drugs and a weapon, and that fact was relevant in establishing that he was part of the charged conspiracy.

d) Admission of the Testimony of Cesário-Soto (Alicea-Torres)

Alicea-Torres makes a separate argument that the government knowingly offered in evidence perjured testimony from witness Cesário-Soto. Cesário-Soto testified at trial that he had observed Alicea-Torres sell drugs at two different drug points.

entered after a trial or upon a plea of guilty . . . adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment").

Alicea-Torres alleges that at an earlier interview conducted by his counsel and attended by the prosecuting attorney, Cesário-Soto stated only that Alicea-Torres was in the area.  That discrepancy provides the basis for the defendant's misconduct claim.

We bypass the question whether the defendant properly preserved the objection and reject on the merits his claim that the prosecution knowingly used perjured testimony.  First, the two statements by Cesário-Soto are not necessarily conflicting.  At the interview, defense counsel did not pursue what was meant by the witness's statement that Alicea-Torres was "in the area."  Second, there was no prejudice.  Defense counsel cross-examined Cesário-Soto as to the supposed conflict between his testimony and the statements he made during the interview.  Moreover, Cesário-Soto was not the only witness to link Alicea-Torres to two different drug points: Negrón-Maldonado testified that Alicia-Torres sold drugs at Calejon Dos and Torrens-Alicea testified that Alicea-Torres conducted drug transactions with Rodríguez-López and spent time at Callejón Nueve.  There is no reasonable likelihood that any false testimony could have affected the judgment of the jury. Cf. Kyles v. Whitley, 514 U.S. 419, 433 n.7 (1995) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.").

e)    Motion to Suppress Exhibit 227, a Photograph, and

Related Testimony
(Fernández-Malavé)

Fernández-Malavé appeals the denial of his motion to suppress a photograph, later admitted as Exhibit 227, of items that appeared to be drugs and that were seized when he was arrested on April 9, 1993.  He contends that the photograph was taken after Officers Rosa-Lopez and Victor-Rivera illegally entered and searched his apartment without a warrant.

The trial court conducted an evidentiary hearing on the suppression motion and held that the warrantless entry was justified by exigent circumstances.  The court made the following factual determinations.  Officer Rosa-Lopez was on routine patrol during the evening of April 9, 1993 when he saw a person carrying a nickel plated gun in his hand.  Before he could respond, the individual noticed Officer Rosa-Lopez (who was in uniform) and began to run in the opposite direction.  Officer Rosa-Lopez pursued the suspect up a nearby stairway between two houses, but lost sight of him when he apparently jumped onto an adjacent patio.  Meanwhile, Officer Victor-Rivera was patrolling the same area when he received notice on his police radio of the pursuit involving Officer Rosa-Lopez.  While he was approaching the area to provide back-up, he observed an individual carrying a black gun.  That individual, on spotting Officer Victor-Rivera (who was in uniform), immediately turned around and ran into a house behind him.  Officer

Victor-Rivera followed the person, later identified as Fernández-Malavé, into the house and pursued him up the stairway. Officer Rosa-Lopez, still searching for the first suspect outside, heard a window open. He turned toward the noise and saw someone drop a gun and a plastic bag containing drugs out of the window. When he looked through the window, he saw Fernández-Malavé inside. He then seized the drugs and the weapon. After a third officer told him that Officer Victor-Rivera was inside, Officer Rosa-Lopez went to the front of the house. Officer Rosa-Lopez explained to Officer Victor-Rivera that he had just observed Fernández-Malavé drop the seized drugs and weapon out of the back window, and Fernández-Malavé was placed under arrest.

This court reviews the district court's findings of fact for clear error and its ultimate Fourth Amendment conclusion de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996). The district court's rendition of facts is not clearly erroneous. Fernández-Malavé unsuccessfully attempts to discredit the court's findings by noting that much of Officer Rosa-Lopez's testimony was not included in an earlier sworn statement of his. There are multiple explanations for why Officer Rosa-Lopez might not have reported certain details about his encounter with Fernández-Malavé in his sworn statement, including his belief at the time that those details were not important. The absence of those details does not establish clear error.

The district court's Fourth Amendment conclusion was correct. Once Fernández-Malavé abandoned the weapon and drugs by throwing them out of the window, he had no reasonable expectation of privacy in those items and their seizure did not itself violate his Fourth Amendment rights. It is well settled that if a defendant abandons property while he is being pursued by police officers, he forfeits any reasonable expectation of privacy he may have had in that property. See Abel v. United States, 362 U.S. 217, 241 (1960). Nevertheless, if Officer Victor-Rivera's pursuit of Fernández-Malavé into his house was unconstitutional, then the evidence of the drugs might well have been subject to suppression as the fruit of an illegal entry. Cf. California v. Hodari D., 499 U.S. 621, 629 (1991); United States v. Lewis, 40 F.3d 1325, 1334 (1st Cir. 1994).

Even without a warrant, police officers are entitled to enter private residences when "exigent circumstances" necessitate such action. See Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999). One consistently recognized example of exigent circumstances encompasses the "hot pursuit" of a suspect the police reasonably believe to be a felon. Minnesota v. Olson, 495 U.S. 91, 100 (1990); Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st Cir. 1995). In such cases, the police are permitted to pursue the fleeing felon into a private residence in order to effect an arrest. See United States v. Santana, 427 U.S. 38, 43 (1976).

-61-

Officer Victor-Rivera's pursuit of Fernández-Malavé falls squarely within the doctrinal confines of the hot pursuit exception, and thus did not violate the Fourth Amendment. We have previously held in a remarkably similar situation that an officer who is looking for a fleeing suspect and has a reasoned basis to think that he has found the suspect is justified in pursuing the suspect into a house. See United States v. Lopez, 989 F.2d 24, 27 (1st Cir. 1993) (holding that police were justified under the hot pursuit doctrine in following defendant into a house because he fit a general description of an armed assault suspect and ran from police when he was ordered to halt). That same conclusion holds here.

Fernández-Malavé also objects on hearsay grounds to the admission of Officer Rosa-Lopez's testimony about a subsequent field test that confirmed that the items in the picture were indeed drugs. The hearsay objection is that Officer Rosa-Lopez did not perform the field test himself, but instead only observed the test as it was conducted. The court correctly overruled this objection at trial. Officer Rosa-Lopez did not testify about an out-of-court statement, see Fed. R. Evid. 801(c), but about his personal observation of the results of the field test.