# United States Court of Appeals
## For the First Circuit

Nos. 11-2160
     12-1814

UNITED STATES OF AMERICA,

Appellee,

v.

NORMA SANTOS-SOTO,
CARLOS PLAZA-SANTIAGO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Kayatta, Circuit Judges.

Gail S. Strassfeld, for appellant Santos-Soto.
Ramón M. González, for appellant Plaza-Santiago.
Tiffany V. Monrose, Scott H. Anderson, Assistant United States Attorneys, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

August 24, 2015

**TORRUELLA, Circuit Judge.** After a six-day jury trial, Defendants-Appellants Norma Santos-Soto ("Santos") and Carlos Plaza-Santiago ("Plaza"), former police agents of the Puerto Rico Police, were convicted of conspiracy to injure, oppress, threaten, and intimidate persons in the town of Arecibo in the exercise of their constitutional rights in violation of 18 U.S.C. § 241 (Count 1) and conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846 (Count 2). On appeal, they challenge the sufficiency of the evidence supporting their convictions on Count 2.[1] After careful consideration, we reverse Santos's conviction on Count 2 for insufficient evidence, but find that there was sufficient evidence to convict Plaza on Count 2. We, therefore, affirm his conviction.

## I. Background

**A. Factual Background**

We recite the facts as the jury could have found them, viewing the evidence in the light most favorable to the jury's verdict. See United States v. Beltrán, 503 F.3d 1, 2 (1st Cir. 2007). Santos and Plaza used to work as police agents in the Arecibo Drug Division of the Puerto Rico Police. In 2007, as members of the "Confidentiality" section, Defendants worked with undercover agents, including Agent José Rodríguez-Vázquez ("Rodríguez"). Santos was in charge of undercover agent Rodríguez.

---

[1] Defendants do not challenge their convictions on Count 1.

-2-

On July 5, 2007, the Puerto Rico Police, Arecibo Drug Division, executed arrest warrants against some individuals. Two of these individuals -- Juan Carlos Aquino-Méndez ("Aquino") and Roberto González-Medina ("González-Medina") -- were arrested based on complaints filed for an alleged drug transaction that took place on February 7, 2007. These complaints were predicated on a sworn affidavit prepared on February 9, 2007, by undercover agent Rodríguez, where he stated that he and a confidential informant, Gerald Hernández-Vera ("Hernández"), had purchased two ounces of cocaine from Aquino and González-Medina on February 7, 2007. However, the information contained in this affidavit detailing the transaction was false.

**The February Incident**

On February 7, 2007, Rodríguez and Hernández did not purchase any drugs from either Aquino or González-Medina. Instead, on February 6, 2007, agent Edgardo Hernández-López (a/k/a "Eggy"), a police officer at the Arecibo Illegal Weapons Unit of the Puerto Rico Police, gave two ounces of cocaine to Hernández to plant on Aquino and González-Medina in order to frame them, because Eggy had a personal grudge against Aquino. On February 7, 2007, Rodríguez and Hernández were supposed to do a controlled buy of drugs from Aquino's alleged pusher, González-Medina. They drove together to González-Medina's house and Hernández got out of the car and walked to the rear side of González-Medina's house to do the controlled

-3-

buy while Rodríguez stayed in the car. Hernández talked briefly to González-Medina's father, but did not purchase any drugs or talk to anyone else. At the time, Hernández had the drugs that Eggy had given him the day before hidden in his boot, but he did not tell this to Rodríguez. Instead, Hernández took out the drugs from his boot and, upon returning to the car, told Rodríguez that González-Medina had just sold him those drugs on behalf of Aquino. Rodríguez then took Hernández home and left with the drugs. While this was taking place, Santos and Plaza were together in a police car in the general vicinity, but they did not see the "transaction" take place. Santos afterwards submitted the drugs for testing to the Institute of Forensic Science,[2] which concluded that they were in fact cocaine.

Two days later, on February 9, 2007, Rodríguez prepared a sworn affidavit, in which he stated that he and the confidential informant, Hernández, had purchased two ounces of cocaine from Aquino and González-Medina on February 7, 2007. Rodríguez's sworn affidavit of February 9, 2007, was then used to support complaints charging Aquino and González-Medina with state drug-related offenses, and arrest warrants were issued against them in July 2007.

**The July Incident**

---

[2] This was normal procedure.

The arrest warrants for Aquino and González-Medina were to be executed on July 5, 2007. Santos assigned the arrest warrants related to the February incident to Agent Bernie González-Vélez ("González-Vélez"), who had joined the Arecibo Drug Division earlier that year. According to González-Vélez's trial testimony,[3] Santos, Plaza, and two other police agents developed a plan whereby González-Vélez and Rodríguez were to conduct a buy-bust operation. Pursuant to the plan, González-Vélez would go to Aquino's house with Rodríguez to buy some drugs from Aquino. After paying for the drugs, González-Vélez would execute the arrest warrant issued as a result of the February complaint. However, Hernández again got cocaine prior to the planned buy-bust. Earlier that day, Hernández obtained fifty baggies of cocaine from Eggy and Agent José González (a/k/a "Tuti"), who also worked at the Arecibo Illegal Weapons Unit of the Puerto Rico Police. Both Eggy and Tuti told Hernández to plant the cocaine on Aquino. According to Hernández's trial testimony, Plaza called him on July 5, 2007, and told him to purchase fifty bags of cocaine from Aquino.

Hernández consumed three to five of the fifty baggies of cocaine that Eggy and Tuti had given him, and then met with González-Vélez and Rodríguez. Hernández gave the remaining forty-five to forty-seven baggies of cocaine to Rodríguez, and told him that he had purchased the drugs from Aquino earlier that day.

---

[3] González-Vélez testified pursuant to a plea agreement.

-5-

Hernández told González-Vélez and Rodríguez that they still needed to pay Aquino for the drugs. Because Hernández had already gotten the drugs, the original buy-bust plan was changed. The officers then planned to pay Aquino for the cocaine that he had allegedly sold Hernández earlier that day, and then arrest him after making the payment. When González-Vélez and Rodríguez suggested that Hernández go with them to pay Aquino for the drugs, Hernández refused. Instead, he requested to be taken home because he feared that Aquino would label him as a snitch and kill him. González-Vélez then radioed the patrol car where Santos and Plaza were and informed them that Hernández did not want to go to Aquino's house and wanted to be taken home instead. Plaza told González-Vélez to take Hernández home, which he did. At no time did González-Vélez tell Plaza that Hernández had already "purchased" the drugs from Aquino or that they already had the drugs.

After dropping Hernández at his house, Rodríguez and González-Vélez arrived at Aquino's house to execute the arrest warrant. There were no other police officers at Aquino's house, but other officers had agreed to be nearby. Rodríguez exited the car and called for Aquino. When Aquino came out of his house, Rodríguez told him that he was there to pay for the drugs he had given earlier to Hernández, but Aquino denied any knowledge of the drugs. Rodríguez then identified Aquino by taking off his watch -- a prearranged signal -- and returned to the car while Aquino went

back into his house.  González-Vélez then exited the car and called Aquino.  When Aquino once again came out of his house, González-Vélez arrested him and searched him, but did not find anything illegal.  González-Vélez then radioed Santos, Plaza, and two other agents who were all together in the same police car and told them that "the target had been arrested."  He did not mention anything about the drugs.  Santos, Plaza, and the other two agents arrived at Aquino's house in less than ten minutes.  Other officers arrived shortly thereafter.  Immediately upon his arrival Plaza asked González-Vélez for the "bundle" of cocaine.  González-Vélez then gave Plaza the drugs that Rodríguez had given him.  Plaza took the "bundle" and told Aquino, "This is yours."  Aquino denied that it was his.  The officers then searched Aquino's house for approximately twenty minutes but did not find anything illegal.  All they found was over $2,000 in a drawer, which González-Vélez seized.  Aquino was taken to the police station in a van, while González-Vélez left with Rodríguez.

Later that day, Plaza arrested Hernández at his house, though his arrest was fake.[4]  He was also taken to the police station and left in a holding cell until the next day, when he was released on bail, which was paid for by Plaza.

---

[4]  Other people, including González-Medina, were also arrested on July 5, 2007.

-7-

After all the arrests were made on July 5, 2007, the agents went back to the police station. There, González-Vélez asked Santos and Plaza what would happen because the drugs had not been seized from Aquino and the buy-bust had not taken place. Santos and Plaza instructed González-Vélez to tell the district attorney that he had seized the drugs from Aquino's person. González-Vélez told Santos and Plaza that "the facts didn't occur like that," to which they responded that "it was Aquino's drugs, submit the case like that." González-Vélez did exactly as Santos and Plaza had instructed. He told the district attorney that he had a search warrant for Aquino and that when he arrested and searched him, he seized drugs and money from Aquino.[5]

In September 2007, in collaboration with the Federal Bureau of Investigation ("FBI"),[6] González-Vélez had three recorded conversations with Santos about the July 5 incident. In these conversations, Santos -- unaware that she was being recorded -- told González-Vélez that he should stick to "the same story" he previously told the district attorney back in July 2007. González-Vélez was unable to record any conversations with Plaza. Also in September 2007, Santos talked to FBI agent Julio Tobar. She told

---

[5] Based on this information, Aquino was charged in state court with drug-related offenses. González-Vélez testified against him in the state proceedings, where he maintained the false version of the events that he had previously told the district attorney.

[6] It is unclear from the record how the FBI first became involved in this case.

Tobar that on July 5, 2007, she learned from Hernández that he had received baggies of cocaine from Aquino, and admitted to Tobar that she instructed González-Vélez to "charge Aquino as if the drugs had been found in his possession," despite knowing that the drugs had not been found on Aquino or in his house.

Subpoenaed phone records of Eggy, Tuti, and Plaza for the months of February, June, July, and September 2007, showed that the telephone calls between Plaza, Eggy, and Tuti significantly increased in frequency on the days before, of, and following the February and July incidents.[7]  Specifically, on February 6, 2007 -- the day when Eggy gave Hernández two ounces of cocaine to plant on Aquino and González-Medina -- the records showed three telephone calls between Eggy, Tuti, and Plaza.  First, Eggy called Tuti, then Plaza called Tuti, and afterwards Eggy and Tuti had another telephone conversation.  On the following day, the day of the February incident, there were nine telephone calls between Eggy, Tuti, and Plaza, and Plaza participated in four of them.  In the morning, Tuti called Eggy, and then called Plaza.  Between 4:18 pm and 4:40 pm, the three agents had four telephone conversations. First, Eggy and Tuti talked, then Plaza called Tuti, and after speaking with Plaza, Tuti called Eggy.  The three of them had additional telephone conversations during the evening.  A similar

---

[7]  Santos's telephone records were not subpoenaed.

pattern was reflected in the records for February 8, the day after the February incident.

The records also showed that from July 2 to July 6, 2007, Plaza had seventeen telephone calls with Tuti and Eggy,[8] and Plaza initiated more than forty percent of these calls.[9] Six of the seventeen telephone calls were prior to the buy-bust, while the remaining eleven were either during or after the planned buy-bust. In addition, during this same period, Tuti and Eggy called each other on thirty-one occasions. The evidence showed not only that Plaza, Tuti, and Eggy were in constant communication during these days, but also that their telephone calls were relatively contemporaneous. Many times two of the agents would talk and immediately upon hanging up the phone, one of them would communicate with the third agent. For example, on July 5, 2007, one hour before the buy-bust operation was scheduled to begin, Tuti and Plaza had a telephone conversation at 3:01 pm that lasted for two minutes. Immediately after hanging up with Plaza, Tuti called Eggy at 3:03 pm. Similarly, later that same day, and close in time to the planned buy-bust operation, Plaza called Tuti at 6:58 pm and talked to him for two minutes. Immediately after finishing his

---

[8]  Ten of these telephone calls were with Tuti, and the remaining seven were with Eggy.

[9]  Fourteen out of the seventeen telephone calls were made on the days before, of, and following the July incident. Eight of these calls were made on July 5, 2007.

conversation with Plaza, Tuti called Eggy at 7:01 pm. The evidence reflects the same pattern of contemporaneous calls between the three of them on the day following the arrest of Aquino, when six telephone calls were made between Eggy, Tuti, and Plaza within a time frame of barely eight minutes.[10]

The telephone records admitted into evidence showed that the telephone calls between Plaza, Eggy, and Tuti around the February and July incidents constituted a spike in relation to the telephone records for the rest of the period examined, which showed that Plaza barely communicated with Eggy or Tuti by phone.[11]

---

[10] For example, on July 6, 2007, Eggy called Tuti at 3:25 pm and talked to him for four minutes, until 3:29 pm. At 3:29 pm Eggy received an incoming call from Plaza. He talked to Plaza for two minutes, until 3:31 pm, when he then received a call from Tuti at 3:31 pm. At 3:32 pm, one minute after Plaza finished his conversation with Eggy, Plaza called Tuti on his phone. Then, right after finishing his conversation with Plaza, Tuti called Eggy at 3:33 pm.

[11] The evidence does not reflect a single telephone call between Plaza and Eggy from late January to February 28, 2007, other than the ones he had on the days of and after the February incident. In addition, the telephone records reflect that during the entire months of June and July 2007, Plaza and Eggy communicated by phone on only three days, aside from the days of and after the July incident. As to his telephone conversations with Tuti, the evidence showed that during the entire month of February 2007, aside from the days of and after the February incident, Plaza communicated with Tuti by phone only on February 14, 2007, which was the day before the Institute of Forensic Science received the drugs from the February incident for testing. The telephone records also reflect that from June 1 to July 31, 2007, Plaza and Tuti communicated by phone on only one day aside from the days around the July incident. We note several telephone calls between Plaza and Tuti in September 2007. Although the parties do not make anything of it, we acknowledge that these calls were made around the time that the FBI initiated its investigation in this case.

-11-

## B. Procedural Background

On October 1, 2007, a grand jury returned a two-count indictment charging Santos and Plaza, along with others,[12] with (1) conspiracy to injure, oppress, threaten, and intimidate persons in the town of Arecibo in the exercise of their constitutional rights in violation of 18 U.S.C. § 241 (Count 1), and (2) conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846 (Count 2).[13]

Santos and Plaza were tried jointly. At the close of the government's case, both Defendants moved for judgments of acquittal under Rule 29 of Federal Criminal Procedure, which the district court denied. After presenting their witnesses, Defendants renewed their motions for acquittal, which were again denied. On October 28, 2010, after a six-day trial, the jury found Santos and Plaza guilty of both counts. Santos was sentenced to concurrent terms of fifty-one months of imprisonment on each count, to be followed by concurrent three-year terms of supervised release on each count, and a $200 special monetary assessment. The district

---

[12] The confidential informant, Hernández, and agents González-Vélez and Rodríguez were also indicted. Hernández pled guilty to the two conspiracy charges, González-Vélez pled guilty to conspiracy to violate constitutional rights, and Rodríguez pled guilty to a charge of withholding information of a felony.

[13] In United States v. Cortés-Cabán, 691 F.3d 1, 16 (1st Cir. 2012), we held that a conspiracy by law enforcement officers to plant controlled substances on victims in order to fabricate criminal cases entails the specific intent to distribute within the meaning of § 841(a)(1).

court sentenced Plaza to concurrent terms of forty-one months of imprisonment on each count, to be followed by concurrent three-year terms of supervised release on each count, and a $200 special monetary assessment. Santos and Plaza appeal their Count 2 convictions only.

On appeal, Santos and Plaza challenge the sufficiency of the evidence supporting their convictions on Count 2, and claim that the district court erred in denying their respective motions for acquittal. Santos argues that the government did not present any evidence that she knew the drugs involved in the February or July incidents did not come from González-Medina or Aquino and, thus, there was no evidence that she had knowledge of the conspiracy to possess with intent to distribute controlled substances. Santos also claims that the government failed to prove that she possessed the intent to distribute controlled substances; that is, that "the cocaine be transferred between police officers in order to be planted on any victim."

Plaza alleges that, as to the February incident, there was no evidence that he had anything to do with the drugs received from Eggy and Tuti for the purpose of fabricating a case against Aquino. In relation to the July incident, Plaza claims that the government failed to produce evidence showing beyond a reasonable doubt that he knew of the existence of the conspiracy to possess

with intent to distribute controlled substances and that he knowingly and intentionally joined said conspiracy.

## II. Discussion

We review de novo the district court's denial of a motion made under Rule 29 for judgment of acquittal. United States v. Ulloa, 760 F.3d 113, 118 (1st Cir. 2014). In so doing, "we examine the evidence, both direct and circumstantial, in the light most favorable to the jury's verdict." United States v. Trinidad-Acosta, 773 F.3d 298, 310 (1st Cir. 2014) (internal quotation marks and citations omitted). We do not focus on each piece of evidence separately. Rather, we evaluate the sum of all the evidence and inferences drawn therefrom, and determine whether that sum is enough for any reasonable jury to find all the elements of the crime proven beyond a reasonable doubt, even if the individual pieces of evidence are not enough when viewed in isolation. United States v. Shaw, 670 F.3d 360, 362 (1st Cir. 2012) ("Individual pieces of evidence viewed in isolation may be insufficient in themselves to prove a point, but in cumulation may indeed meet the mark."); United States v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993) ("[J]uries are not required to examine the evidence in isolation, for individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." (internal quotation marks omitted)). Also, in

reviewing the sufficiency of the evidence, "[w]e do not assess the credibility of a witness, as that is a role reserved for the jury. Nor need we be convinced that the government succeeded in eliminating every possible theory consistent with the defendant's innocence." Trinidad-Acosta, 773 F.3d at 310-11 (internal quotation marks and citations omitted). "Rather, we must decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime," id. at 311 (internal quotation marks and citations omitted), even if that conclusion is not inevitable. United States v. Floyd, 740 F.3d 22, 30 (1st Cir. 2014) (The evidence "suffices if the conclusions that the jury draws from [it], although not inevitable, are reasonable."). "The verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a reasonable doubt." United States v. Rodríquez-Vélez, 597 F.3d 32, 39 (1st Cir. 2010) (emphasis omitted); United States v. Azubike, 564 F.3d 59, 64 (1st Cir. 2009) (holding that so long as "any reasonable jury could find all the elements of the crime beyond a reasonable doubt, we must uphold the conviction" (internal quotation marks omitted)). Thus, "defendants challenging convictions for insufficiency of evidence face an uphill battle on

-15-

appeal." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008) (citation omitted) (internal quotation marks omitted).

Nevertheless, "we must 'reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" United States v. Rodríguez-Martínez, 778 F.3d 367, 371 (1st Cir. 2015) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)). "Where the evidence presented does not support the inference that a defendant had knowledge of the crime, we have consistently found the evidence insufficient." Id. (citing United States v. Pérez-Meléndez, 599 F.3d 31, 42 (1st Cir. 2010)).

To sustain a drug-conspiracy conviction, the government must prove beyond a reasonable doubt that the defendant "knew about and voluntarily participated in the conspiracy, 'intending to commit the underlying substantive offense.'" United States v. Acosta-Colón, 741 F.3d 179, 190 (1st Cir. 2013) (quoting United States v. Ortiz de Jesús, 230 F.3d 1, 5 (1st Cir. 2000)). "An agreement to join a conspiracy may be express or tacit, and may be proved by direct or circumstantial evidence," Trinidad-Acosta, 773 F.3d at 311 (quoting United States v. Liriano, 761 F.3d 131, 135 (1st Cir. 2014)), such as inferences "drawn from members' words and actions and from the interdependence of activities and persons involved." Acosta-Colón, 741 F.3d at 190 (internal quotation marks omitted); see also United States v. Martínez-Medina, 279 F.3d 105,

113-14 (1st Cir. 2002) ("The jury may infer an agreement circumstantially by evidence of, _inter alia_, a common purpose . . . , overlap of participants, and interdependence of various elements in the overall plan.").

A defendant need not know the full extent of the drug-trafficking conspiracy or the identities of all the co-conspirators to be convicted. <u>See</u> <u>Ortiz de Jesús</u>, 230 F.3d at 5. Further, a defendant may be found to be a part of the drug-trafficking conspiracy -- despite a lack of participation in the drug collection, handling, or sales -- based upon performance of ancillary functions (e.g., accounting, communications, and strong-arm enforcement). <u>See</u> <u>United States</u> v. <u>García-Torres</u>, 280 F.3d 1, 4 (1st Cir. 2002); <u>see also</u> <u>Trinidad-Acosta</u>, 773 F.3d at 311 ("[E]ach coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." (internal quotation marks omitted)). However, "it is hard to imagine how someone furnishing a peripheral service to a drug conspiracy could be deemed to 'join' that conspiracy unless he knew both that the drug conspiracy existed and that the peripheral service being furnished was designed to foster the conspiracy." <u>García-Torres</u>, 280 F.3d at 4 (emphasis omitted). With that background in place, we turn to the individual Defendants.

**A. Santos**

As noted above, the evidence showed that Santos was in charge of undercover agent Rodríguez, who was told by Hernández that the two ounces of cocaine from the February incident were purchased from Aquino. Although Santos was with Plaza and other agents in the general vicinity during the February incident, she did not see the alleged "transaction" take place. Santos did submit the drugs related to the February incident to the laboratory for testing. She also assigned the arrest warrants related to the February incident to González-Vélez and, in conjunction with other officers, developed the plan for the buy-bust operation of July 5.

In relation to the July incident, the evidence showed that Hernández once again told Rodríguez that he had purchased fifty baggies of cocaine from Aquino, and that at the time of the alleged transaction Santos was in the same police car as Plaza and other agents, and they were in the general vicinity.

While at some point Santos learned that the drugs had not been seized from Aquino's person, she still instructed González-Vélez to lie to the district attorney and tell him that they had in fact been seized from Aquino at the time of his arrest. She also encouraged González-Vélez several times to stick to this lie.

Santos alleges that this evidence is insufficient for a reasonable jury to conclude beyond a reasonable doubt that she had knowledge of the conspiracy to distribute controlled substances and knowingly and voluntarily participated in it. We agree.

The trial testimony revealed that Hernández never disclosed that he had gotten the drugs from someone other than Aquino or González-Medina, and the government offered no evidence from which to infer that Santos knew that the drugs involved in the February or July incidents came from someone other than Aquino. In fact, at oral argument the government stated that it could not point to any evidence demonstrating that Santos did not believe that Aquino was the real source of the drugs.

As evidence supporting Santos's Count 2 conviction, the government points most strongly to Santos's encouragement of González-Vélez to lie to the district attorney by telling him that he had seized the drugs from Aquino. In fact, when asked at oral argument about the scant evidence against Santos supporting her Count 2 conviction, the government stated that "Santos joined the conspiracy late, when she asked [González-Vélez] to lie." According to the government, by so doing Santos "tacitly agreed to join the conspiracy to possess with intent to distribute controlled substances." In fact, the government stated at oral argument that Santos's encouragement of González-Vélez to lie to the district attorney was the "only evidence" of Santos's knowledge about the distribution of controlled substances.

It is well-established that a defendant need not know the full extent of a conspiracy, the identity of all the co-conspirators, may join the conspiracy late, and participate in

-19-

only ancillary functions.  See United States v. Soto-Beníquez, 356 F.3d 1, 23 (1st Cir. 2003); García-Torres, 280 F.3d at 4; Ortiz de Jesús, 230 F.3d at 5.  However, a defendant must know that a conspiracy exists and that his participation, even if limited to a peripheral service, is designed to foster that conspiracy. García-Torres, 280 F.3d at 4.  Here, the evidence shows that Santos encouraged González-Vélez to lie to the district attorney regarding the seizure of the drugs.  Although this and other evidence could be sufficient to find "a conspiracy to violate the civil rights of the victims by providing false evidence to the Commonwealth Courts," (Count 1) this evidence is insufficient to prove that Santos knew of the conspiracy to distribute controlled substances and elected to join it intending that the underlying offense be committed (Count 2).  Santos's knowledge of a conspiracy to possess with intent to distribute controlled substances cannot be based only on her knowledge of a different conspiracy -- the conspiracy to violate the civil rights of victims.

By the same token, although Santos submitted the drugs to the Institute of Forensic Science for testing, this does not lead to a reasonable conclusion that she was distributing the drugs in furtherance of the conspiracy.  "[I]t is hard to imagine how someone furnishing a peripheral service to a drug conspiracy could be deemed to 'join' that conspiracy unless he knew both that the

drug conspiracy existed and that the peripheral service being furnished was designed to foster the conspiracy."  Id.

Without evidence from which the jury could infer beyond a reasonable doubt that Santos knew of the conspiracy to possess with intent to distribute controlled substances, Santos's conviction on Count 2 cannot stand.

**B.  Plaza**

The record shows that on July 5, 2007, Eggy and Tuti gave Hernández fifty baggies of cocaine to plant on Aquino.  On that same date, Plaza called Hernández and instructed him to buy fifty baggies of cocaine from Aquino.  Upon his arrival at Aquino's house after González-Vélez had arrested Aquino, Plaza asked González-Vélez for the "bundle" of drugs and, once González-Vélez gave him the drugs, Plaza confronted Aquino stating, "This is yours."  Some time later at the police station, when González-Vélez asked Plaza how to submit the case to the district attorney because the drugs had not been seized from Aquino's person, Plaza instructed González-Vélez to lie to the district attorney and claim that the drugs had in fact been seized from Aquino's person.  The trial evidence also showed that there was a spike in telephone calls between Plaza, Eggy, and Tuti on the days before, of, and following both the February and July incidents, when the three agents were in constant communication and had numerous relatively contemporaneous telephone calls.

-21-

Plaza contends that this evidence is insufficient for a rational jury to conclude that he is guilty beyond a reasonable doubt of having participated in the drug conspiracy. He alleges that the fact that he instructed Hernández to buy from Aquino the exact amount of cocaine provided by Eggy and Tuti is not indicative that he was part of the drug conspiracy. Plaza also claims that the telephone calls between him, Eggy, and Tuti were unrelated to the alleged conspiracy, as they all worked together, knew each other for years and communicated frequently for business and personal reasons. Plaza further argues that the testimony from his two witnesses contradicts the testimony of one of the government's main witnesses. Finally, he claims that the government failed to call Aquino and González-Medina -- the victims -- to testify in this case, and to bring charges against Eggy and Tuti, the drug suppliers. His contentions lack merit.

Viewing the direct and circumstantial evidence in the light most favorable to the guilty verdict, a reasonable jury could conclude that Plaza knowingly and voluntarily participated in the conspiracy and intended to commit the underlying substantive offense. See Mena-Robles, 4 F.3d at 1031 (articulating the requirements to convict a defendant of conspiracy as the intent "to agree and to commit the substantive offense that was the object of the agreement"). Such knowing and voluntary participation and intent are demonstrated by Plaza's actions and words during both

incidents. See id. ("[J]uries are not required to examine the evidence in isolation, for individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992))). There was evidence that on the days before, of, and after the two incidents, Plaza was in constant communication with Eggy and Tuti via their personal telephones, and that Plaza initiated a significant amount of these calls. This, even though Tuti and Eggy worked in a different area within the Puerto Rico Police -- the Arecibo Illegal Weapons Unit -- and they were not involved in the planned buy-bust operation that was being conducted by the Arecibo Drug Division. Not only were Plaza's telephone calls with Eggy and Tuti constant during those days, but the telephone calls between the three of them were also relatively contemporaneous, with many times two of the agents finishing a conversation and immediately calling the third agent. The evidence also showed that Plaza otherwise rarely had telephone conversations with either Tuti or Eggy, and that the records only showed a spike in calls between them around the two incidents. Furthermore, there was evidence that on the day of the planned buy-bust operation, all communications related to the operation were made over a dedicated police radio frequency and not over the agents' personal telephones. In addition, the evidence showed that

Plaza instructed González-Vélez to lie to the district attorney and claim that the drugs had in fact been seized from Aquino, despite being repeatedly told by González-Vélez that this was not true. When viewed as a sum of the evidentiary presentation, a reasonable inference could be drawn that Plaza had no legitimate, work-related reason to be in constant communication with Eggy and Tuti around the days of the two incidents -- much less using their personal telephones -- and that his unusually frequent and relatively contemporaneous telephone calls with Tuti and Eggy show that he was aware of the "essential nature" of the conspiracy and intended to commit the substantive offense in that he planned to plant those drugs on Aquino.[14]  See United States v. Geer, 923 F.2d 892, 894 (1st Cir. 1991).

Plaza points out that the government did not provide evidence as to the content of the telephone conversations, and that it did not prove that there was a substantial number of calls made around the time of the two incidents, compared with the calls made during other months prior to or subsequent to the dates of the incidents.  Plaza further claims that he knew Tuti and Eggy for

---

[14]  In reaching our conclusion, we do not rely on the fifty-baggies congruence or on Plaza's "this is yours" comment, since we do not find that they have any inculpatory weight under the circumstances of this case.

years as coworkers and thus the three of them frequently communicated for both personal and business reasons.[15]

Contrary to Plaza's assertions, the government did introduce telephone records that extended beyond the dates of the two incidents. The telephone records of Eggy and Tuti encompassed all telephone calls to and from their telephones for the entire months of February, June, July, and September 2007. A review of these telephone records clearly revealed an unusual spike in telephone calls between Plaza and the drug suppliers on the days before, of, and following both incidents. In any event, the issue on review is not whether there exists an innocent explanation; the issue is whether when examining the evidence as a whole the jury could reasonably reject that explanation. United States v. Floyd, 740 F.3d 22, 30 (1st Cir. 2014).

Plaza further argues that the testimonies of his two witnesses -- Feliciano and Centeno -- contradict the testimony of one of the government's main witnesses. However, the jury heard the testimony of all the witnesses and made its credibility determinations. On appeal, we cannot re-weigh the evidence or second-guess the jury's credibility determinations.[16] See Trinidad-

---

[15] In its brief, the government pointed out that "absolutely no evidence was produced regarding the length of time [Eggy, Tuti, and Plaza] knew each other, where they lived, or whether they had frequent personal or business communications."

[16] Furthermore, after a careful review of the record we disagree that any such contradictions exist.

Acosta, 773 F.3d at 310-11 ("We do not assess the credibility of a witness, as that is a role reserved for the jury." (quoting Troy, 583 F.3d at 24)); Acosta-Colón, 741 F.3d at 191 ("[T]hough we exercise de novo review, we can neither re-weigh the evidence nor second-guess the jury's credibility calls."); United States v. Ayala-García, 574 F.3d 5, 11 (1st Cir. 2009) ("[T]he jury [is] free to choose which of the two conflicting accounts of the events to believe, so long as the evidence viewed in the government's favor is adequate to establish guilt beyond a reasonable doubt.").

Finally, we decline Plaza's invitation to find the evidence insufficient to support his conviction because the government did not call all possible witnesses to testify, or include in the indictment other co-conspirators. When we assess the sufficiency of the evidence supporting a conviction, we must focus on the evidence actually submitted at trial. See Trinidad-Acosta, 773 F.3d at 310-11; see also United States v. Guzmán-Montañez, 756 F.3d 1, 12 (1st Cir. 2014) (emphasizing that what matters is the evidence introduced at trial); United States v. García, 758 F.3d 714, 721-22 (6th Cir. 2014) (holding that in evaluating a sufficiency-of-the-evidence challenge "we may not consider the potential magnitude of the evidence not presented," because doing so would be "an invitation to examine whether the Government might have presented a more convincing case, not whether

it in fact presented a sufficient one").[17] Because the basis for the jury verdict is the evidence that was submitted for its consideration, we do not consider the magnitude of additional evidence that could have been presented in determining whether the evidence that was actually submitted was sufficient to convict the defendant. Nor do we take into consideration that certain individuals were not indicted, as that is a matter within the sole discretion of the prosecution. See United States v. Nixon, 418 U.S. 683, 693 (1974) (noting that "Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case"). And, here, we conclude that the sum of all the evidence and the inferences drawn therefrom, especially the evidence of Plaza's telephone communications with Eggy and Tuti, the drug suppliers, and the evidence that he instructed González-Vélez to falsely submit the case to the local district attorney, is sufficient circumstantial evidence that Plaza was aware of, and knowingly participated in the conspiracy to possess with intent to distribute controlled substances. See Floyd, 740 F.3d at 30 (The court's "focus must be on the evidence as a whole. . . . [and] [i]t suffices if the conclusions that the jury draws from the evidence, although not inevitable, are reasonable."). While the conclusion

---

[17] Moreover, we have repeatedly stated that "[t]estimony from even just 'one witness can support a conviction.'" United States v. Alejandro-Montañez, 778 F.3d 352, 357 (1st Cir. 2015) (quoting United States v. De La Paz-Rentas, 613 F.3d 18, 25 (1st Cir. 2010)).

-27-

that Plaza knew of the drug conspiracy and participated in it intending that the underlying substantive offense be committed may not be inevitable based on the evidence, it soundly rests on sufficient evidence.  Thus, Plaza's conviction on Count 2 is affirmed.

### III.  Conclusion

The evidence submitted at trial to support Santos's conviction on Count 2 was insufficient for a reasonable jury to conclude beyond a reasonable doubt that she had knowledge of the drug conspiracy and voluntarily participated in it, intending that the underlying substantive offense be committed.  Thus, Santos's conviction on Count 2 is **reversed**.  In contrast, this evidence, which included acts specifically attributed to Plaza, was sufficient to sustain Plaza's conviction as to the same Count 2. Therefore, Plaza's conviction on Count 2 is **affirmed**.